HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ERIC CARLSON, a single man,

Plaintiff,

v.

LEWIS COUNTY HOSPITAL DISTRICT NO. 1,  a Washington government entity; ROSS JONES, a married man; JUDY RAMSEY, a married woman; KENTON SMITH, a married man; MARC FISHER, a married man; SHANNON KELLY, a married woman; and SHERI HENDRICKS, a married woman,

Defendants.

NO. 3:15-CV-05913-RJB

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER OF PARTIAL SUMMARY JUDGMENT

Noting Date:  January 27, 2017
[Oral Argument Requested]

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

# I.      INTRODUCTION

Defendants respectfully request that the Court deny Plaintiff's Motion for an Order of Partial Summary Judgment ("Motion") in its entirety.  Seth Whitmer was the sole person with authority to terminate Plaintiff's employment; the Commissioners merely provided him input and received a report from him after the termination.  Because the ultimate decision was Whitmer's, the Commissioners admittedly are unable to testify with certainty regarding the reason for Plaintiff's termination.  It does not follow, however, that Whitmer's account of events is unimpeachable.  The Commissioners and other witnesses have personal knowledge of their own statements and actions, and their testimony, in conjunction with Whitmer's prior inconsistent statements and actions, are more than sufficient to create an issue of fact to defeat summary judgment.

The most glaring example of a material dispute of fact is the Defendants' complete denial of any discriminatory intent.  The Commissioners have all provided sworn testimony that they were not concerned about Plaintiff's sexual orientation, they did not instruct Whitmer to terminate Plaintiff based on his sexual orientation, and they did not discuss Plaintiff's sexual orientation at any point in any discussion related to his termination.  The Commissioners' and other witnesses' testimony about learning of the fraud allegation against Plaintiff also undermines Whitmer's testimony that the fraud allegations were not the true reason for Plaintiff's termination, as do numerous of Whitmer's own statements.  Finally, the conflicting evidence on several points, as well as the possibility that Whitmer's Affidavit was motivated by his desire to obtain Plaintiff's support for his own threatened lawsuit, both undermine Whitmer's credibility, a determination of which should be left to the jury.  In short, there is more than sufficient competent evidence to permit a trier of fact to find for Defendants on Plaintiff's discrimination claim.

Regarding Plaintiff's procedural due process claim, the undisputed evidence dictates that summary judgment is proper for Defendants, not for Plaintiff, because of the lack of

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 1
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

1    stigmatizing information in Plaintiff's termination letter.  Moreover, if Plaintiff were entitled to

2    a name-clearing hearing, there are issues of fact regarding the sufficiency of the process

3    provided.  Finally, Plaintiff's Motion is premature in that the deposition of Whitmer, Plaintiff's

4    primary witness, has not yet occurred.  At a minimum, the Court should defer ruling until the

5    parties have the benefit of Whitmer's full testimony.

## II.    FACTS

7          This action arises out Plaintiff's termination from the Chief Financial Officer position

8    he held for just six weeks.  Plaintiff alleges his termination was based on his sexual orientation.

9    Defendants deny discriminating against Plaintiff and state that he was terminated because it

10   came to light that he had previously engaged in concerning financial conduct that disqualified

11   him from holding the high-level position of CFO of a public hospital.

### A.    MGH's former CEO hired Plaintiff without adequate due diligence.

13         Lewis County Public Hospital District, doing business as Morton General Hospital

14   ("MGH") is a 25-bed critical access public hospital located in Morton, Washington.[1]

15         MGH's former Chief Executive Officer, Seth Whitmer, hired Plaintiff Eric Carlson for

16   the open CFO position the day he came in for an interview, on November 21, 2014.

17   Declaration of Victoria Slade ("Slade Decl.") at Ex. A, Deposition of Eric Carlson ("Carlson

18   Dep."), at 112:12-25; 114:21-115:14.  Plaintiff claimed to have decades of finance experience

19   pertaining to the medical industry; however, he did not provide the names of any of the medical

20   entities where he had worked, and his references were individuals with whom he had a personal

21   or business relationship, rather than former employers.  *Id.* at 115:7-10; 127:18-128:18.

22   Nevertheless, Whitmer offered Plaintiff the CFO position the day of his interview, indicating

23   that he wanted Plaintiff to start work immediately.  *Id.* at 117:18-118:3.

24   ///

25   ///

26

[1] *See* http://www.mortongeneral.org/about-us.

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

**B.     Commissioners received troubling information about Plaintiff's past from community members and passed the information along to Whitmer.**

Plaintiff's first week or two of employment passed without incident.[2]  Plaintiff received a $10,000 sign-on retention bonus, which was not based on performance.  Slade Decl. at Ex. B, Deposition of Shannon Kelly ("Kelly Dep.") at 28:21- 29:6.  *See also id.* at 29:18-19 (stating Plaintiff received a bonus because "Seth gave sign-on bonuses to nearly [sic] person he hired.").  During the month of December, however, members of the Board of Commissioners ("BOC") started receiving troubling information from members of the community about Plaintiff's past.

Commissioner Ross Jones was contacted by two different community members who were concerned about a document related to a bankruptcy proceeding involving Plaintiff.  Slade Decl. Ex. C, Deposition of Rosslyn Jones ("Jones Dep.") at 24:2-24.  The document suggested to Jones that "unethical behavior happened."  *Id.* at 27:9-15.  On December 24, 2014, the Commission Chair at the time, Sheri Hendricks, received an email from a former commissioner, Glen Allen, attaching a document related to the same bankruptcy case.  Slade Decl. Ex. D, Deposition of Sheri Hendricks ("Hendricks Dep.") at 15:12-19.  Hendricks read the document and saw that it contained concerning information about "a lady losing her life savings."  *Id.* at 17:7-8.  Another Commissioner, Kenton Smith, was at church one day when a woman he did not know approached him and gave him a document related to the bankruptcy proceeding, saying, "Read this."  Slade Decl. Ex. E, Deposition of Kenton Smith ("Smith Dep.") at 15:8-16:3.  The woman's husband approached Smith at church a week or two later and asked if he had read the document.  *Id.* at 15:20-16:3.

///

---

[2] Defendants do not dispute that Plaintiff's job performance was adequate and that he had ideas for improving MGH's financial systems; however, Defendants have never admitted Plaintiff's exaggerated version of the hospital's finances.  *See* Defendants' Answer to Complaint, Dkt. 10, at ¶13 (admitting that "the accounting department at MGH had challenges with its systems that resulted in issues with its financial statements" but denying the remaining allegations in the paragraph).

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER OF PARTIAL SUMMARY JUDGMENT - 3
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

Yet another Commissioner, Marc Fisher, was shopping at the local hardware store sometime between Christmas and New Year's Eve of 2014 when the store owner, Joy Watt, called him into her office, gave him a copy of the same document, and said, "Look what I got, you better read it." Slade Decl. Ex. F, Deposition of Marc Fisher ("Fisher Dep.") at 4:24-5:7; 19:12-20:10. The fifth Commissioner, Judy Ramsey, learned of the bankruptcy document from Fisher, whom she understood had received it from Joy Watt. Slade Decl. Ex. G, Deposition of Judy Ramsey ("Ramsey Dep.") at 20:23-22:2 (testifying that Watt had "a document off the Internet" related to "some kind of lawsuit that Eric was part of" involving "fraud against a lady in Centralia."). *Id.*

The Commissioners were concerned about the document they had received from various community members. Shortly after receiving the document, Hendricks spoke with Commissioners Fisher and Smith about its contents, and both she and Smith stated they had concerns. Hendricks Dep. at 16:5-18:7. Jones also discussed the document with Fisher because he thought its contents "seem[ed] unethical." Jones Dep. at 26:1-27:15. Fisher spoke with Smith, and the two agreed that the situation was "serious." Fisher Dep. at 21:10-22:10; 33:17-34:16. They were concerned that they "have a man that committed a fraud in [sic] heading our finance department." *Id.* at 23:3-6.

Around the same time, Fisher also spoke with Dr. Floyd Smith, Plaintiff's previous employer. *Id.* at 23:9-24:22. Dr. Smith told Fisher that he had a "very bad" experience with Plaintiff and had concerns about his billing practices. *Id.* Commissioner Smith also recalled a phone call with Dr. Smith in which Dr. Smith told him he had lost money to Plaintiff and cautioned that "no matter what, Mr. Carlson should not be in a position where he could handle money or accounts." Smith Dep. at 23:1-25. Dr. Smith described "financial irregularities" while Plaintiff was his employee, including the "[i]nappropriate transfer of funds that couldn't adequately be explained." Slade Decl. Ex. H, Deposition of Dr. Floyd Smith ("Dr. Smith Dep.") at 8:5-10. Dr. Smith testified that he spoke to Commissioner Smith and to Whitmer and

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 4
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1  told them about his concerns regarding Plaintiff, and about various other people who had had

2  difficulties with Plaintiff. *Id.* at 30:22-32:25; 39:24-41:1.

3      Commissioner Smith also heard from a friend of his who is a former private

4  investigator, Michael Hurley, who had concerns about Plaintiff in relation to finances and

5  warned that Plaintiff should not be employed at MGH.  Smith Dep. at 29:23-30:11; 25:24-26:1.

6  **C.**    **The bankruptcy documents contain a statement that suggests Plaintiff defrauded an elderly woman for $300,000.**

7

8      The documents that were circulating around the community related to a bankruptcy

9  adversary proceeding decision involving Plaintiff.  *See In re Carlson*, No. 10-04412-BDL

10  (Bankr. W. D. Wash., Aug. 23, 2011) (copy attached).  In that case, Plaintiff and his former

11  romantic partner had a relationship with a wealthy elderly woman in the community, whom

12  Plaintiff was aware had a reputation for "handing out money to other people around town

13  without requiring any documentation."  *Id.* at *2.  The court's opinion states that Plaintiff

14  "made himself quite involved in [the elderly woman's] financial affairs" and ultimately

15  obtained an unsecured loan of $300,000 of the woman's money.  *Id.*

16      Plaintiff defaulted on the loan and attempted to have the debt discharged in bankruptcy.

17  *Id.* at *5.  The opposing party accused Plaintiff of obtaining the loan through fraud. *Id.* at *4.

18  Although the court ultimately discharged the debt, it was troubled by the facts of the case.  It

19  wrote,

20          ***The Court believes there was a fraud perpetrated here, and [Plaintiff] was at***
        ***least part of it.***  He was in difficult financial straits, having used up his line of

21          credit with Security State Bank to settle a lawsuit.  He saw an opportunity to
        obtain control over an elderly woman's finances, and ultimately received

22          $300,000, money he needed to finance his new venture.  Unfortunately and
        inexplicably, [the elderly woman] is not the plaintiff in this action.

23

24  *Id.* at *7 (emphasis added).  The Bankruptcy Appellate Panel of the Ninth Circuit affirmed. *See*

25  *In re Carlson*, No. WW-11-1486-KiJuH, 2012 WL 1859450 (May 22, 2012).

26  ///

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 5
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
206 464 3939

GSB:8349484.2

**D.    The Commissioners raised the fraud issue with Mr. Whitmer, who was responsible for determining what action to take.**

MGH is governed at the policy level by the BOC and at the administrative level by a superintendent, or Chief Executive Officer.[3]  The BOC is empowered to hire and fire only the CEO, not other staff.  Smith Dep. at 9:11-14 ("The CEO is the only person the board hires and - - and the only person the board fires.").  When it comes to the termination of other positions, the BOC "let[s] [the] CEO run the show. And that means that the CEO does all of the hiring and firing and then reports it back to the board."  *Id.* at 12:14-23.

Pursuant to the BOC's and the CEO's respective roles in the organization, the Commissioners conveyed their concerns to Whitmer and waited for him to take the next steps.  Smith testified that he brought the bankruptcy document to Whitmer and said he "thought he should take a look at [it]."  *Id.* at 20:5-12.[4]  Fisher also contacted Whitmer about the document asked him "what's he going to do about it?"  Fisher Dep. at 30:3-20.   Fisher told Whitmer, "You have got to make a decision. . . . [regarding] whether to keep Mr. Carlson."  *Id.* at 30:5-18.   Hendricks also reached out to Whitmer about the document, at which point Whitmer indicated he had already spoken to Fisher and Smith, who he stated were "concerned about the fraud allegations in the paper, in that paper."  Hendricks Dep. at 21:19-22.

The BOC also discussed the fraud allegation with Whitmer at one or more Board meetings.  Jones recalled that BOC "expressed grave concerns about ethics."  Jones Dep. at 28:4-19.   Ramsey also recalled the Board discussing the fraud allegation with Whitmer in a Board meeting: "we were bringing from the community, and then after seeing that, that that was a concern, and he needed to look into it further."  Ramsey Dep. at 25:13-19; 24:22-25:5 (describing a conversation regarding Plaintiff's involvement "in a lawsuit of fraud or a lawsuit with an elderly woman in Centralia where the attorney . . . stated fraud on this elderly woman.").  Fisher admitted he applied pressure to Whitmer to terminate Plaintiff based on the

---

[3] *See* http://www.mortongeneral.org/pages/hospital-leadership; RCW 70.44.070-090.
[4] Smith believes he relayed the information from Dr. Smith to Whitmer as well.  Smith Dep. at 34:8-13.

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington 98101-2939*
*206 464 3939*

1    fraud language in the court's decision, although when Whitmer asked if his job was at risk,

2    Fisher stated, "I don't know.  I'm just one vote."  Fisher Dep. at 63:14-22.

3          Although the BOC did provide input to Whitmer about their concerns over the

4    bankruptcy document, they did not express any concern related to Plaintiff's sexual orientation

5    or any distaste about having a gay man as a member of MGH's leadership team.  *See*

6    Declarations of Ross Jones, Marc Fisher, Kenton Smith, Sheri Hendricks, and Judy Ramsey.

7    They did not instruct Whitmer to terminate Plaintiff based on his sexual orientation.  *Id.*  In

8    fact, they did not discuss Plaintiff's sexual orientation at all during any of the conversations

9    related to Plaintiff or his termination.  *Id.*

10   **E.   Whitmer acted quickly to terminate Plaintiff after learning of the Commissioner's
11   and community member's concerns.**

12         At the time the BOC alerted Whitmer to the fraud concerns that were spreading around

13   the community, Whitmer was already aware of the bankruptcy document.  Diane Markham,

14   MGH's Director of Marketing, who was at the time a member of the MGH leadership team,

15   had been told by members of the community who contributed to the hospital's charitable

16   foundation that there was a bankruptcy case that related to Plaintiff.  Slade Decl. Ex. I,

17   Deposition of Diane Markham ("Markham Dep.") at 9:16-13:10.  She shared that information

18   with Shannon Kelly, who passed the information along to Whitmer.  Kelly Dep. at 36:13-37:2.[5]

19   Once the BOC informed Whitmer of the community members' and their concerns, however,

20   Whitmer quickly became motivated to terminate Plaintiff's employment.  He called Board

21   Chair Hendricks and told her he was "setting [steps to terminate Plaintiff] in motion."

22   Hendricks Dep. at 32:9-22.

23         As Director of Human Resources, Kelly was involved in the termination process,

24   including in communications with Whitmer and with Commissioners.  She testified,

25   

26   [5] Kelly did not look up the case or read the document because all she knew about it was that it related to
bankruptcy, and the fact that an individual has filed for bankruptcy is not a proper basis for an employment action.
Declaration of Shannon Kelly at ¶5.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 7
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

A: So I -- when I gave the information to Seth, Seth was – he said that he was going to terminate Eric's employment, and I was a bit hesitant about that. I thought that there should be more conversation, but he was wanting to move forward.
Q: Why did Mr. Whitmer want to terminate Mr. Carlson? . . .
A: Okay. So based on some wording or some statements by a judge about whether or not Eric had committed fraud, that's why Seth was going to terminate him.

Kelly Dep. at 35:16- 36:10.[6]

Whitmer called Plaintiff in for a meeting on December 31, 2014, at which time he confronted Plaintiff with the statement regarding fraud contained in the bankruptcy court document. *See* Declarations of Shana Garcia and Shannon Kelly in Support of Defendants' Motion for Reconsideration and/or Clarification, Dkt. 42 (at Ex. A), Dkt. 43 (at Ex. A). He asked for Plaintiff's side of the story. *Id.* He also asked Plaintiff to explain the language in the judicial opinion that stated Plaintiff had forwarded Dolores McMurphy's medical records to a third party. *Id.* Plaintiff provided his side of the story on both items. *Id.* Whitmer told Plaintiff that he was going to look into it further and that Plaintiff would have an opportunity to share more information. Kelly Dep. at 43:17-48:5. At that meeting, Whitmer notified Plaintiff that he was placing him on administrative leave. Dkt. 42 (at Ex. A), Dkt. 43 (at Ex. A).

After that meeting, Plaintiff's attorney from the bankruptcy proceedings, Larry Fagerness, contacted Whitmer and explained Plaintiff's legal position. Carlson Dep. at 165:25-166:14. He explained to Whitmer "how the case worked and what the real story was behind it." *Id.* On January 5, 2014, Plaintiff returned for a second meeting and shared more information about the bankruptcy proceedings. Dkt. 42 (at Ex. B), Dkt. 43 (at Ex. B). Following the meeting, Whitmer informed Kelly that he had decided to move forward with terminating Plaintiff. Kelly Dep. at 47:23-48:5. *See also* Slade Decl. Ex. J, Deposition of Shana Garcia ("Garcia Dep.") at 24:24- 25:3 (Whitmer told Plaintiff that "based on the

---

[6] In her deposition, Kelly could not disclose the contents of the communications or the information she was provided because it was protected by the attorney client privilege. Kelly has confirmed, however, that the subject of sexual orientation was not discussed in any of the conversations she took part in regarding Plaintiff's termination. Kelly Decl. at ¶3.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER OF PARTIAL SUMMARY JUDGMENT - 8
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1    information that he had received and having Eric serve as our CFO, and so it was just the

2    opinion of the judge about the fraud, he couldn't have someone sitting and representing in that

3    seat in a public hospital.").   Whitmer signed Plaintiff's January 5, 2015, termination letter,

4    which stated:

5            As you know, we met yesterday and I shared with you the significant concerns
             that led me to consider the termination of your employment.  You provided me
6            with your perspective on those concerns and some additional information.  I
             have taken all of the information you provided into account.  I have, however,
7            ultimately decided that you cannot continue as our CFO.

8    Slade Decl. Ex. K.

9            Whitmer informed Markham and Garcia that he had terminated Plaintiff due to fraud.

10   Garcia Dep at 13:7-16:11 (recalling that Plaintiff was fired because "it was the opinion of the

11   judge that in a case that he was in that he had committed fraud."); Markham Dep. at 20:4-11

12   (Whitmer told her at a leadership team meeting that Plaintiff had been fired because of "the

13   fraud situation.").

14           Whitmer announced to the BOC at the January 6, 2015, Board meeting that he had

15   terminated Plaintiff.  Hendricks Dep. at 19:14-19; 32:23-33:3.  Hendricks recalls that Whitmer

16   "sounded boastful" while speaking about Plaintiff's termination, as if he was "pretty proud that

17   he had terminated him."  *Id.* at 20:14-23.  Although the Commissioners were not directly

18   involved and therefore could not say with 100% certainty what motivated Whitmer, the

19   connection between them raising the fraud concerns and Plaintiff's termination quickly

20   thereafter led them to conclude the termination was based on fraud.  Fisher Dep. at 32:4-33:3

21   (stating he assumed that fraud was the reason for the termination); Ramsey Dep. at 28:1-4

22   (stating she assumed Plaintiff was terminated "because of the CFO, having a fraud on your

23   record of some sort, should not be handling finances, so I assumed.").

24   ///

25   ///

26   ///

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 9
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

**F.      Contrary to Plaintiff's argument, numerous witnesses have relevant personal knowledge and provided information for Defendants' discovery responses.**

Plaintiff took the depositions of eight MGH Commissioners and employees, none of whom had ever been deposed before and all of whom are unfamiliar with the legal process. Declaration of Victoria Slade in Support of Defendants' Motion for Reconsideration and/or Clarification, Dkt. 41, at ¶ 2.   Plaintiff's counsel presented each with Defendants' 27-page discovery responses and asked each deponent to look through the entire document and let him know what input he or she had provided.   *Id.*   The deponents attempted to answer Plaintiff's questions, but the record reflects some confusion.

Ross Jones testified he could not answer Mr. Frawley's question about the document "without extensive review of it" and stated, "This will take me an hour and a half to detail everything."   Jones Dep. at 5:5-6:11.   Jones also later stated, "I'm not inclined to make long readings."   *Id.* at 25:20.   When Fisher was presented with the document, he asked "I'm supposed to read all that?"   Fisher Dep. at 59:18.   After Mr. Frawley indicated he should state what information he has responding to the questions, Fisher reviewed the document, then asked, "So which one am I supposed to answer?"   *Id.* at 60:18. When Ramsey was asked which questions she had provided information for, she asked, "What - - like, can you tell me where the questions are?"   Ramsey Dep. at 16:15.   Smith, after being presented the document and asked if he recognized it, asked, "So what are you saying I should do?"   Smith Dep. at 42:2-21.

Despite the ambiguity of Mr. Frawley's questions, the witnesses did indicate they had provided information responsive to the discovery responses.   Hendricks testified that she provided information regarding the response to Interrogatory No. 6, which requested information regarding the discovery of concerns about Plaintiff's background.   Hendricks Dep. at 23:19-25:11.   Fisher also testified that he provided information in response to Interrogatory No. 6, as did Ramsey.   Fisher Dep. at 60:24-61:6; Ramsey Dep. at 16:24-17:5.   Smith testified he had knowledge of "the discovery of information regarding Plaintiff's past financial conduct"

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1    and "knowledge of the decision that he would be terminated."  Smith Dep. at 43:20-44:6.  And

2    Jones testified that he knew that Plaintiff's termination was based on "concerns of some

3    previous experience in a case where there was a court case that had come up where. . . there

4    was some ethical concern . . . in the community."  Jones Dep. at 22:23-23:22.

5                                    **III.    ISSUES PRESENTED**

6         1.      Whether the Court should deny summary judgment on Plaintiff's discrimination

7    claims under the Washington Law Against Discrimination and the Equal Protection Clause

8    when (1) all evidence of discriminatory intent is disputed; (2) there is sufficient evidence to

9    support a finding that a prior fraud allegation was the true reason for his termination; and (3)

10   the credibility of Plaintiff's primary witness, Whitmer, is an issue for the trier of fact?

11        2.      Whether the Court should grant summary judgment to Defendants on Plaintiff's

12   procedural due process claim where Plaintiff's termination letter did not contain any

13   stigmatizing information and therefore Plaintiff was not entitled to a name-clearing hearing?

14        3.      Whether the Court should deny summary judgment to Plaintiff on his procedural

15   due process claim where (1) the evidence shows he received two opportunities to present his

16   side of the story; (2) he admits he did present his side of the story, including by having his

17   lawyer telephone Whitmer; and (3) the credibility of Plaintiff's primary witness, Whitmer, is an

18   issue for the trier of fact?

19                                       **IV.    ARGUMENT**

20        Summary judgment should be granted only when there are no genuine issues of material

21   fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c);

22   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202

23   (1986).  A genuine issue for trial exists if the non-moving party presents evidence from which a

24   reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the

25   material issue in his or her favor. *Id.* at 248–49; *Dark v. Curry County,* 451 F.3d 1078, 1082,

26   n. 2 (9th Cir. 2006) ("[t]he burden on the nonmoving party is not a heavy one; the nonmoving

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206  464  3939*

GSB:8349484.2

1   party simply is required to show specific facts, as opposed to general allegations, that present a

2   genuine issue worthy of trial.") (citation omitted).  On summary judgment, "[t]he evidence of

3   the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

4   *Anderson*, 477 U.S. at 255.

5       The sole piece of affirmative evidence Plaintiff offered in support of his Motion is the

6   Affidavit of Hiram Seth Whitmer ("Whitmer Affidavit").  As the Court is aware, Defendants

7   dispute the facts in Whitmer's affidavit that pertain to Plaintiff's termination, and Whitmer's

8   deposition has not yet taken place.  Additionally, the admissibility of Whitmer's allegations

9   regarding privileged communications is still an open issue, and the attorney-client privilege

10  therefore prevents Defendants from responding to Plaintiff's allegations related to legal advice.

11  Despite these pending issues, even on the existing record, it is plain that Plaintiff is not entitled

12  to summary judgment on any of his claims.

13  **A.      Plaintiff cannot meet the difficult standard for summary judgment on his
14           Washington Law Against Discrimination claim.**

15      In considering a summary judgment motion in an employment discrimination case, the

16  court will apply the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S.

17  792 (1973).  "Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title

18  VII must first establish a prima facie case of discrimination."  *Chuang v. University of*

19  *California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).[7]  If the Plaintiff establishes a prima

20  facie case, the burden of production "shifts to the employer to articulate some legitimate, non-

21  discriminatory reason for the challenged action."  *Id.*  If the employer does so, the plaintiff

22  must show that the articulated reason is pretextual either directly by persuading the court that a

23  discriminatory reason more likely motivated the employer or indirectly by showing that the

24  employer's proffered explanation is unworthy of credence.  *Id.* at 1123-24 (quotations and

25

26  ------

[7] Washington courts interpreting the WLAD may look to federal case law interpreting Title VII.  *Kumar v. Gate Gourmet Inc.*, 180 Wash. 2d 481, 491, 325 P.3d 193 (2014).

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 12
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1   citations omitted).  The ultimate question of discrimination "is one that can only be resolved

2   through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a

3   full record."  *Id.*  (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101

4   S. Ct. 1089, 67 L.Ed.2d 207 (1981)).

5         When a plaintiff moves for summary judgment instead of a defendant, the *McDonnell*

6   *Douglas* burden shifting analysis applies, but once the employer meets its burden, "the

7   *McDonnell Douglas* framework disappears and the sole remaining issue . . . is discrimination

8   *vel non*."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 77 (2d Cir. 2001) (quoting *Reeves v.*

9   *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000)); *St. Mary's Honor Ctr. v.*

10  *Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (once defendant carries

11  its burden of production, "the *McDonnell Douglas* framework—with its presumptions and

12  burdens—is no longer relevant.").  The Plaintiff must therefore meet his ultimate burden of

13  proving that he was the victim of intentional discrimination without the benefit of *McDonnell*

14  *Douglas'* intermediate burdens and presumptions.  *Id.*

15        **1.**    **All of Plaintiff's evidence of discriminatory intent is disputed.**

16        Plaintiff contends "there is no dispute that Mr. Carlson was fired because he was gay"

17  because "Mr. Whitmer unequivocally testifies that Mr. Carlson was fired because he is gay"

18  and "Defendants have not identified any individual with knowledge of why Mr. Carlson was

19  fired and therefore cannot present testimony to the contrary."  Motion at 13.  While it is true

20  that the Commissioners do not have personal knowledge of Whitmer's thought process in

21  terminating Plaintiff, they do have personal knowledge of their conversations with him about

22  the subject, and the Commissioners can and do dispute making discriminatory comments or

23  instructing Whitmer to terminate Plaintiff based on his sexual orientation.

24        The Commissioners deny all of Whitmer's allegations that they made comments about

25  Plaintiff's sexual orientation.  Ross Jones and Judy Ramsey deny Whitmer's allegation that,

26  after meeting Plaintiff, they told Whitmer that "they absolutely 'did not like him."  Declaration

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 13
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206  464  3939*

GSB:8349484.2

1   of Ross Jones ("Jones Decl.") at ¶2; Declaration of Judy Ramsey ("Ramsey Decl.") at ¶2. Both

2   also deny expressing any "distaste" over having a gay man in a leadership role at MGH. Jones

3   Decl. at ¶2, Ramsey Decl. at ¶2. In fact, both Ramsey and Jones recall having a positive first

4   impression of Plaintiff. Jones Decl. at ¶2, Ramsey Decl. at ¶2. Marc Fisher and Kenton Smith

5   deny being "disturbed" by Plaintiff's sexual orientation and deny Whitmer's claim that they

6   hired a private investigator to find information about Plaintiff that would justify his

7   termination. Declaration of Marc Fisher ("Fisher Decl.") at ¶2; Declaration of Kenton Smith

8   ("Smith Decl.") at ¶¶2, 4.

9          Although these are the only allegations by Whitmer that include specific comments by

10  specific individuals, the Commissioners also deny Whitmer's more general allegations. They

11  all deny telling Whitmer they did not want a gay man working at MGH, having any issue with

12  a gay man on the leadership at MGH, being disturbed by Plaintiff's sexual orientation, or

13  instructing Whitmer to terminate Plaintiff based on his sexual orientation. Jones Decl. at ¶3;

14  Ramsey Decl. at ¶3; Fisher Decl. at ¶3; Smith Decl. at ¶5; and Declaration of Sheri Hendricks

15  ("Hendricks Decl.") at ¶2.

16         All Commissioners also deny there being any discussion of Plaintiff's sexual orientation

17  as a reason to terminate his employment at either of the Board meetings that occurred during

18  Plaintiff's tenure at MGH. Jones Decl. at ¶5; Ramsey Decl. at ¶4; Smith Decl. at ¶6; Fisher

19  Decl. at ¶5; Hendricks Decl. at ¶3. In fact, the Chairperson of the Commission at the relevant

20  time, Sheri Hendricks, has a close family member who is a lesbian; she asserts that not only

21  would she remember if there had been any discussion of Plaintiff's sexual orientation, but if

22  there had been any she would have objected. Hendricks Decl. at ¶¶3-4.

23         Shannon Kelly, who is the Director of Human Resources for MGH, denies the one

24  comment related to sexual orientation that is attributed to her in Plaintiff's Complaint.

25  Declaration of Shannon Kelly ("Kelly Decl.") at ¶2. Kelly also states that she was involved in

26  various meetings and conversations with Whitmer and the BOC during the time of Plaintiff's

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 14
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

GSB:8349484.2

termination and that there was absolutely no discussion of Plaintiff's sexual orientation in relation to his termination. *Id.* at ¶3. She also states that she did not hear anyone express any concern over Plaintiff's sexual orientation or express any concern about having a gay employee at MGH. *Id.* Far from being concerned about Plaintiff's sexual orientation, Kelly testifies that she was aware that Plaintiff was gay, liked him, and considered him a friend. *Id.* at ¶4. Moreover, as an experienced Human Resources professional, Kelly was well aware of the prohibition against sexual orientation discrimination and would not have allowed such conduct to occur at MGH. *Id.* at ¶12.

Given that every single allegation related to Plaintiff's sexual orientation is disputed, the Court cannot grant summary judgment for Plaintiff on his discrimination claim.

## 2. The facts underlying Plaintiff's claim that fraud was not the true reason for his termination are disputed.

Where a plaintiff is attempting to defeat the summary judgment motion of a defendant, she can create an issue of fact "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang*, 225 F.3d at 1124. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves,* 530 U.S. at 143.

As described above, Whitmer's hearsay allegations that Commissioners made vague statements related to Plaintiff's sexual orientation is significantly outweighed by the five Commissioners' sworn statements that they did not make any such comments and Kelly's statement that she never heard mention of Plaintiff's sexual orientation in her conversations with Whitmer or the BOC. Plaintiff also cannot show the absence of a material fact regarding Whitmer's claim that the fraud allegation was mere pretext and not the true basis for his termination.

///

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER OF PARTIAL SUMMARY JUDGMENT - 15
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

Each of the Commissioners testified about how they learned of the bankruptcy-related document. Fisher, Jones, Hendricks, and Smith all heard about it from different members of the community, and Ramsey heard about it from Fisher. Additionally, Kelly and Markham describe Markham learning of the document from members of the community as well. All of the Commissioners deny Whitmer's claim that they hired a private investigator to look into Plaintiff's background. Jones Decl. at ¶4; Ramsey Decl. at ¶5; Hendricks Decl. at ¶5; Fisher Decl. at ¶4; Smith Decl. at ¶4. Although Plaintiff cites an excerpt of Jones's deposition that he states is to the contrary, the remainder of the testimony on this subject reveals that Jones is not actually personally aware of whether Smith or anyone else on the Commission hired an investigator. Jones Dep. at 43:24-44:16. In reality, Smith received some information from a friend of his who used to run an investigation business and had previously looked into Plaintiff's background on an unrelated matter. Smith Decl. at ¶4; Fisher Decl. at ¶4.

MGH employee testimony also undercuts Whitmer's statement that he was not concerned about the Court's observations about Plaintiff's involvement in fraudulent conduct and did not terminate Plaintiff on that basis. Kelly recalls that Whitmer wanted to move fast to terminate Plaintiff once the Commissioners raised the issue of fraud, and that he told her he could not have someone who had committed fraud occupying the role of CFO. Kelly Decl. at ¶8. The fact that Whitmer hired Plaintiff on the same day he interviewed him, and without confirming any of his previous employment experience or even asking for the names of Plaintiff's previous employers, would tend to support Kelly's testimony that Whitmer was in a hurry to terminate Plaintiff before the next Board meeting, so as to correct his mistake. *Id.* at ¶10. Finally, both Shana Garcia and Diane Markham recall Whitmer saying that Plaintiff had been terminated due to fraud. Garcia Dep. at 13:7-16:11; 24:24-25:3; Markham Dep. at 20:4-11.

Plaintiff's argument that concerns regarding the fraud allegation were pretextual also ignores the significance of the judicial opinion itself, which constitutes evidence supporting a

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 16
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

GSB:8349484.2

1    reasonable inference that Plaintiff's termination was legitimate.   Plaintiff held a high-level

2    financial position at a hospital run with public funds.   There was a publically available

3    document outlining conduct that a judge described as fraudulent, involving Plaintiff accepting

4    $300,000 from an elderly woman and not paying it back.   Moreover, there is evidence that

5    Plaintiff's former employer Dr. Smith communicated to BOC members and to Whitmer that

6    Plaintiff had stolen from him.[8]   Taking all of Defendants' evidence as true and making all

7    reasonable inferences in Defendants' favor, a reasonable juror could easily find it difficult to

8    believe Whitmer's claim that he did not find this disqualifying for a CFO.

9         **3.       Whitmer's credibility is an issue for the trier of fact.**

10        Plaintiff admits that his entire case rests on the Whitmer Affidavit.   *See* Carlson Dep. at

11   19:17-20:4 (Whitmer's statement is the sole basis for his belief he was terminated unlawfully);

12   21:8-22:20 (Whitmer's statement is the sole reason for his belief that the BOC and Shannon

13   Kelly were biased against him); 27:24-28:5 (admitting the only foundation for his allegation

14   that he was fired for being gay is Whitmer).   As the Court is aware, the parties dispute many

15   elements of Whitmer's Affidavit.   Indeed, Plaintiff himself has even argued that "The Alleged

16   'False Premise' of Mr. Whitmer's Veracity is a Question for Trial" and emphasized that

17   "[q]uestions regarding the veracity of a witness and the weight given to the evidence are

18   addressed by the trier of fact."   Dkt. 36 at 3-4.

19        "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

20   inferences from the facts are jury functions, not those of a judge, whether he is ruling on a

21   motion for summary judgment or for a directed verdict."   *Anderson*, 477 U.S. at 255.   At this

22   stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to

23   be drawn in his favor."   *Id.*   This would include the inference that the Whitmer Affidavit is not

24   fully truthful.

25

26   _____
[8] Plaintiff admits he believes Dr. Smith "absolutely" had a role in sabotaging his position at Morton.   Carlson Dep. at 76:12-24; 81:4-6.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 17
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1    Beyond the disputed facts in the Whitmer Affidavit and Whitmer's prior inconsistent

2    statements,[9] there is other evidence that makes his credibility an issue for the jury.  Whitmer

3    reached out to Plaintiff soon after his own termination from employment at MGH, and he

4    purported to disclose confidential and attorney-client privileged information that he was

5    entirely unauthorized to reveal.  Dkt. 25 at Ex. B, p. 6-7.  Contrary to his own prior statements

6    and actions, he told Plaintiff that he only terminated him because he was under duress from the

7    Commission.  *Id.*  Whitmer then obtained Plaintiff's agreement to sign a declaration in support

8    of Whitmer's threatened claims against MGH.  *Id.*  A reasonable juror could easily find that

9    Whitmer had a motive to mislead Plaintiff, in order to get him to support Whitmer's claims

10   against MGH.

11   In addition, Whitmer's actions following Plaintiff's termination are inconsistent with

12   his claim that he was not concerned about a federal judge's observation that Plaintiff had been

13   involved in perpetrating a fraud upon an elderly woman in a nearby community.  For example,

14   Whitmer hired a forensic investigation company after Plaintiff's termination, to see if Plaintiff

15   had engaged in any inappropriate computer usage on MGH's systems.  Hendricks Dep. at

16   47:17-48:12.   Whitmer also told others after Plaintiff's termination that he had gotten

17   Lifelock,[10] a service that protects against identify theft, and he suggested that others do so as

18   well, in order to protect their personal information.  *Id.* at 48:2-8; Kelly Decl. at ¶11.

19   Finally, numerous witnesses have testified that they found Mr. Whitmer not to be

20   credible.  Kelly, for example, testified she did not trust him because "every day he told a

21   different story, so he would spin a story, and then the next day, if it didn't fit, he would spin a

22   different story."  Kelly Dep. at 61:14-19.  As an example, she testified that, following

23   Plaintiff's termination, Whitmer took credit for one of Plaintiff's achievements, his saving

24   several jobs in the billing department from outsourcing.  *Id.* at 61:19-62:3.  Jones also testified

25

26   _____

[9] Such statements are admissible for purposes of impeaching Whitmer.  Fed. R. Evid. 613.
[10] See https://www.lifelock.com/.

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1   that he had a "trust issue" with Whitmer, and Fisher testified that Whitmer was "untruthful."

2   Jones Dep. at 36:25-37:1; Fisher Dep. at 44:24-25.

3       Given the importance of Whitmer's testimony and the conflicting evidence, Whitmer's

4   credibility is a critical issue, and it cannot be decided on summary judgment.

5   **B.      The disputed facts regarding discriminatory intent preclude summary judgment on Plaintiff's Equal Protection claim.**

6

7       The Court should also deny summary judgment on Plaintiff' Equal Protection Claim.  It

8   is far from undisputed that Plaintiff was terminated based on his sexual orientation—in fact, the

9   vast majority of the evidence demonstrates this theory lacks merit.

10  **C.      Plaintiff's due process claim is legally insufficient and factually unsupported.**

11      **1.      The Court should dismiss Plaintiff's due process claim because he was legally not entitled to a name-clearing hearing**.

12

13      Plaintiff's procedural due process claim must fail as a matter of law because the lack of

14  stigmatizing information in his termination letter means he was not entitled to a name-clearing

15  hearing.   In fact, the Court should grant summary judgment to Defendants on this claim.

16  *Kassbaum v. Steppenwolf Prod., Inc.*, 236 F.3d 487, 494-95 (9th Cir. 2000) (in deciding one

17  party's summary judgment motion, a district court can, *sua sponte*, grant summary judgment to

18  the non-movant without a cross-motion).

19      A public employee who is terminable at will, like Plaintiff was, is not entitled to

20  procedural due process merely by virtue of his public employment.  *Dyack v. Commonwealth of

21  Northern Mariana Islands*, 317 F.3d 1030, 1033 (9th Cir. 2003) (where "a state employee

22  serves at will, he or she has no reasonable expectation of continued employment, and thus no

23  property right."); *Lawson v. Umatilla County*, 139 F.3d 690, 691-91 (9th Cir. 1998) ("Under

24  the federal constitution, at-will employees possess no protected property rights and therefore

25  are not entitled to due process before being terminated.").  Instead, Plaintiff was only entitled to

26  procedural due process if MGH published stigmatizing information about him, such as by

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 19
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

placing it in his personnel file.  *Cox. v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004).

Unpublicized accusations do not infringe constitutional liberty interests because, by definition, they cannot harm "good name, reputation, honor, or integrity."  *Bishop v. Wood*, 426 U.S. 341, 348, 96 S. Ct. 2074, 48 L.Ed.2d 684 (1975).  Where an employer does not publicize the reason for an employee's termination, no name-clearing hearing is required.  *Id.* (holding that the plaintiff was not deprived of any liberty interest in a case in which "there is no public disclosure of the reasons for the discharge"); *Bollow v. Fed. Reserve Bank of San Francisco*, 650 F.2d 1093, 1101 (9th Cir. 1981) (no due process violation where employer's reasons for firing employee "were never publicly disclosed."; "When reasons are not given, inferences drawn from dismissal alone are simply insufficient to implicate liberty interests."); *Haimowitz v. Univ. of Nev.*, 579 F.2d 526, 529 (9th Cir. 1978) (no name-clearing hearing required where employee did not allege that employer "publicized false, defamatory, or stigmatizing statements about him in connection with his termination" and where, "[i]n fact, no reasons at all were ever made public.").

It is undisputed in this case that MGH did not include the reason for Plaintiff's termination in his termination letter.  Slade Decl. Ex. K.  The letter merely states that Whitmer had "significant concerns" and that he decided Plaintiff "[could] not continue as our CFO."  *Id.*  Plaintiff acknowledges that there is nothing negative about him in the letter, including no allegation that he committed fraud.  Carlson Dep. at 174:14-175:20.  Instead, he testified that the letter is simply "boilerplate."  *Id.*  Because MGH did not publish stigmatizing information about Plaintiff, he was not entitled to a due process hearing, and his claim should be dismissed.[11]  *See, e.g.*, *Howard v. Contra Costa Cty.*, No. 13-CV-03626 NC, 2014 WL 4230000, at *4 (N.D. Cal. Aug. 26, 2014) (termination did not "trigger the requirement to

---

[11] To the extent Plaintiff argues that the reason for his termination was publically known via newspaper articles for which he himself was interviewed, this does not revive his procedural due process claim.  *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1131 (9th Cir. 2001), *as amended* (Mar. 14, 2001) (holding that "to allow the potentially stigmatized party to satisfy the publication prong by disseminating the details surrounding his termination would contradict the purposes of the publication requirement as made clear in subsequent Supreme Court precedent.")

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206  464  3939*

1    provide a name-clearing hearing" where "neither the fact of the termination nor the reasons for

2    it were publicized by defendants.").

3        **2.      Plaintiff is not entitled to summary judgment because the process here was**
         **sufficient.**

4

5        Even if Plaintiff were entitled to a name clearing hearing, there is an issue of fact

6    regarding whether the process here was sufficient.

7        A name-clearing hearing for a public employee need not be formal so long as it

8    provides the essential requirements of notice of the charges and an opportunity to respond.

9    *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 545, 105 S. Ct. 1487, 84 L. Ed. 2d.

10   494 (1985).   The parameters of the required process are governed by the balancing test of

11   *Matthews v. Eldridge,* 424 U.S. 319, 335, 96 S. Ct. 893, 47 L.Ed.2d 18 (1976).   The factors are

12   (1) the interest affected; (2) the risk of an erroneous deprivation of such interest through the

13   procedures used, and the probable value, if any, of additional or substitute procedural

14   safeguards; and (3) the Government's interest, including the function involved and the fiscal

15   and administrative burdens that the additional or substitute procedural requirement would

16   entail. *Id.*

17       The evidence here shows that Whitmer confronted Plaintiff with the Court's language

18   regarding fraud on December 31, 2014.   Shana Garcia and Shannon Kelly both attended the

19   meeting and took notes. Dkt. 42, 43.   The notes show that Whitmer asked Plaintiff for his side

20   of the story and that Plaintiff provided a good deal of information.   *Id.*   Plaintiff also has

21   testified that he told his side of the story at that meeting and that the information he provided

22   should have changed Whitmer's mind.   Carlson Dep. at 173:3-13.   He also confirmed that his

23   lawyer for the bankruptcy matter called Whitmer and explained Plaintiff's position in more

24   detail.   *Id.* at 166:2-14.   The evidence also shows that Plaintiff received a second opportunity

25   to provide information, at the January 5, 2015, meeting with Whitmer, Garcia, and Kelly.   Dkt.

26   42, 43.   Finally, the termination letter that Mr. Whitmer signed states that he has considered

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 21
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington  98101-2939*
*206 464 3939*

1    Plaintiff's side of the story.  Slade Decl. Ex. K.  Although the Whitmer Affidavit states the

2    decision was a foregone conclusion, the evidence suggests that Plaintiff did in fact have the

3    opportunity to present his side of the story.  Moreover, to the extent the Whitmer Affidavit

4    conflicts with the testimony of the other two witnesses to the meetings, Plaintiff's recollection,

5    and the letter Whitmer signed, this is an issue of fact for trial.

6    **D.**    **There is an issue of fact regarding whether MGH is liable for Whitmer's actions.**

7    Plaintiff states that a governmental entity like MGH can be liable under §1983 where

8    (1) the challenged conduct was the result of an official policy or a custom so pervasive that it

9    constituted policy; (2) the challenged conduct was the result of a deliberate choice by the

10    official responsible for establishing final policy with respect to the subject matter in question;

11    or (3) the governmental entity's policymakers delegated policymaking authority to a

12    subordinate or ratified a subordinate's decision.  *Miguel v. Guess*, 112 Wash. App. 536, 51 P.3d

13    89 (2002).

14    Plaintiff argues that all of the Commissioners "voiced their displeasure at having

15    Plaintiff, a gay man, acting as the chief financial officer of [MGH].").  He also states the BOC

16    "encouraged [Plaintiff's] firing and then voiced their approval of his firing after the fact."

17    Although Plaintiff cites to the Whitmer Affidavit at ¶¶14-15, the Affidavit does not support

18    these factual assertions.  Moreover, as discussed above, the Commissioners all deny making

19    any statements about Plaintiff's sexual orientation.  Indeed, the vague allegations in the

20    Whitmer Affidavit would be insufficient to *defeat* a summary judgment motion, let alone

21    sufficient to justify summary judgment in Plaintiff's favor.  *Angel v. Seattle-First Nat. Bank*,

22    653 F.2d 1293, 1299 (9th Cir. 1981) ("A motion for summary judgment cannot be defeated by

23    mere conclusory allegations unsupported by factual data.").  There is at the very least an issue

24    of fact on this claim.

25    ///

26    ///

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 22
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
*eighteenth floor*
*1191 second avenue*
*seattle, washington   98101-2939*
*206 464 3939*

GSB:8349484.2

1   **E.      Defendants invoke FRCP 56(d).**

2       Plaintiff's motion is based primarily on the affidavit on an individual who has not yet

3   been deposed, Whitmer.  Therefore, at a minimum, the Court should deny Plaintiff's motion or

4   defer ruling on it until after Whitmer's deposition pursuant to Fed. R. Civ. Proc. 56(d).  Rule

5   56(d) provides, in part, "If a nonmovant shows by affidavit or declaration that, for specified

6   reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer

7   considering the motion or deny it; [or] (2) allow time to obtain affidavits or declarations or to

8   take discovery. . . ." FRCP 56(d).   "[T]he granting of summary judgment will be held to be

9   error when discovery is not yet completed, and summary judgment has been denied as

10  premature when the trial court determines that discovery is not finished." 10B WRIGHT

11  MILLER KANE, FEDERAL PRACTICE AND PROCEDURE, §2741, pp.377-381 (4th Ed.

12  2016).

13      Given the importance of Whitmer's testimony, the Court should deny summary

14  judgment or defer ruling until after his deposition.

15                              **V.      CONCLUSION**

16      Plaintiff argues that because only Whitmer had authority to terminate Plaintiff, Whitmer

17  is the only one who can testify as to the reasons for the termination.  In reality, the evidence

18  shows that various members of the community provided the Commissioners with a court

19  decision that contained troubling allegations and observations related to Plaintiff engaging in

20  concerning financial conduct, and that Whitmer terminated Plaintiff based on that document

21  after hearing of the Commissioners' concerns.  Moreover, Whitmer's prior statements and his

22  conduct are consistent with his terminating Plaintiff based on that document.    Finally,

23  Whitmer's credibility is an issue for the trier of fact.

24      Plaintiff's Motion falls far short of proving there is no issue of material fact on his

25  claims, and it should be denied.  If the Court does not deny the Motion on this basis, it should

26  at least deny or defer ruling on the Motion until after Whitmer's deposition.

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 23
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
eighteenth floor
1191 second avenue
seattle, washington 98101-2939
206 464 3939

1    DATED this 23rd day of January, 2017.

2                                    GARVEY SCHUBERT BARER

3

4                            By   *s/ Victoria M. Slade*
                                 Diana S. Shukis, WSBA #29716
5                                Victoria M. Slade, WSBA #44597
                                 1191 Second Avenue, 18th Floor
6                                Seattle, WA  98101-2939
                                 Phone:  (206) 464-3939
7                                Fax:  (206) 464-0125
                                 Email:  dshukis@gsblaw.com
8                                Email:  vslade@gsblaw.com
                                 Attorneys for Defendants
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 24
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

GSB:8349484.2

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on January 23, 2017, I electronically filed the foregoing document

3   with the Clerk of the Court using the CM/ECF system which will send notification of such

4   filing to the following:

5       Joseph D. Frawley                    joedfrawley@gmail.com
        SCHEFTER & FRAWLEY
6       Attorney for Plaintiff

7
        Diana S. Shukis                      dshukis@gsblaw.com
8       GARVEY SCHUBERT BARER                gnelson@gsblaw.com
        Attorney for Defendants             lolsen@gsblaw.com
9

10      Victoria M. Slade                    vslade@gsblaw.com
11      GARVEY SCHUBERT BARER                gnelson@gsblaw.com
        Attorney for Defendants
12
        SIGNED this 23rd day of January, 2017, at Seattle, Washington.
13

14

15                              _s/ Greta Nelson_____
                                Greta Nelson, Legal Assistant
16                              GARVEY SCHUBERT BARER
                                1191 Second Avenue, 18th Floor
17                              Seattle, WA  98101-2939
                                Phone:  (206) 464-3939
18                              Fax:  (206) 464-0125
                                Email:  gnelson@gsblaw.com
19

20

21

22

23

24

25

26

DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT - 25
(CASE NO. 3:15-CV-05913)

GARVEY SCHUBERT BARER
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
eighteenth floor
1191 second avenue
seattle, washington  98101-2939
206 464 3939

GSB:8349484.2

# ATTACHMENT TO

# DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ORDER OF PARTIAL SUMMARY JUDGMENT

Entered on Docket August 23, 2011

1  BRIAN D. LYNCH
   United States Bankruptcy Judge
2  1717 Pacific Ave, Suite 2155
   Tacoma, WA 98402
3

4

5

6

7

8              **UNITED STATES BANKRUPTCY COURT**
        **WESTERN DISTRICT OF WASHINGTON AT TACOMA**

9   In re:

10  ERIC G. CARLSON                                    Case No. 10-47408-BDL

11               Debtor.

12  CARSON TAYLOR,

13               Plaintiff,

14      v.                                        Adversary No. 10-04412-BDL

15  ERIC G. CARLSON,

16               Defendant.                          **FINDINGS OF FACT AND**
                                                     **CONCLUSIONS OF LAW**
17

18       Plaintiff Carson Taylor ("Taylor") filed this adversary proceeding against Defendant/Debtor Eric

19  Carlson ("Carlson") seeking a determination of non-dischargeability of a state court judgment under 11

20  U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). Defendant Carlson argued that Plaintiff Taylor's 523(a)(2)(A)

21  claim failed as there were no representations or fraudulent statements made by Carlson and those

22  statements that Taylor alleged were made were solely statements as to Carlson's financial condition.

23  Carlson further contended that the 523(a)(2)(B) claim failed because no written statement was

24  exchanged, and that Plaintiff's claims under both sections were precluded by the doctrines of res

25  judicata and judicial estoppel because fraud claims were not made in the prior state court proceeding.

                                              1

1   Trial was held July 20, 2011.  Plaintiff and Defendant stipulated to the admission of each
2   party's disclosed exhibits, Plaintiff's exhibits P1 –P4 and Defendant's exhibits D1-D24 and amended
3   D19.  Plaintiff and Defendant were the only two witnesses

4   This Court has jurisdiction pursuant to 28 U.S.C. § 1334. This matter is a core proceeding
5   under 28 U.S.C. § 157(b)(2)(B) and (I). The following are my findings of fact and conclusions of law
6   under Fed. Rule Bankruptcy Procedure 7052 and Fed. Rule C ivil Procedure 52:

7   In the fall of 2007, Carson Taylor moved to Centralia, Washington and became friends with a
8   person named Daniel LaPlante.  Taylor worked at a Centralia mortuary for LaPlante for some period of
9   time, and LaPlante helped Taylor make arrangements to rent a house from Delores McMurphy in
10  September 2007.  McMurphy was in her early 80's at the time Taylor met her, and she is apparently
11  known in the community as someone of some wealth. Sometime after that, in late 2007, Taylor met
12  Eric Carlson through LaPlante. Taylor and Carlson became personal friends. Carlson met McMurphy
13  through Taylor, and visited her house 2 to 3 times with Taylor, even recalling that he and Taylor had
14  taken McMurphy a hot dog on one occasion. Carlson acknowledged he was aware of McMurphy's
15  reputation of handing out money to other people ar ound town without requiring any documentation.

16  Eric Carlson had lived in Chehalis, Washington for 15 years at the time of trial. In 2008, he was
17  the owner and operator of two entities, Archimedes Group International Inc. (AGI) and College
18  Enrollment Services Management Inc. (CES), which were in the business of placing foreign students in
19  schools in the United States. Carlson has been in the foreign student placement business for over 20
20  years, working for larger companies and then operating a series of his own companies for over 15
21  years.  The latest one, prior to AGI and AES, had been called Academic Exchange of America, doing
22  visas under the J-1 program.  Carlson closed Academic Exchange of America in 2007 when the U.S.
23  Department of State began contracting the number of operators under the J-1 program and Carlson
24  became tired of working with host families. Carlson had come up with a new business idea in 2007, in
25  which he would work with colleges in the U.S., especially community colleges, to place foreign
students under a different visa program sponsored by the State Department. He was able to convince

2

15 colleges to pay him $10,000 per college to recruit foreign students to place with colleges, and to pay him for those students he placed.

In early 2008, McMurphy determined to sell her house and move in with Taylor in the house she was renting to him.   The sale occurred in February 2008, the move occurred in the same timeframe, and Carlson helped McMurphy move into the house with Taylor. Taylor testified that some time in that same period he went with McMurphy to see her attorney at the time, Paul Dugaw, about an alleged theft by her prior caregivers. In June of 2008, McMurphy transferred her bank accounts into joint accounts with Taylor. Later that same month, McMurphy signed a durable power of attorney naming Taylor as her attorney in fact.  Although McMurphy had gone to see Dugaw about the alleged theft by her caregivers, the power of attorney was prepared by a different attorney – Brian Kelly, who apparently had no other involvement with the case or McMurphy.  Also in late June 2008, McMurphy transferred title of her real property by quit claim deed out of her name and into a joint tenancy for her and Taylor. Taylor testified that both the power of attorney and the deed were done at the advice and suggestion of Carlson, and that he went so far as to call Carlson from the title company to get direction on how to fill out the deed.

It is clear even from the conflicting testimony that Carlson made himself quite involved in McMurphy's financial affairs. Though he and Dugaw were apparently neighbors and friends, Carlson had been advising McMurphy and Taylor that Dugaw was after McMurphy's money due to a large financial loss allegedly sustained by Dugaw in a hedge fund.   Particularly revealing was a July 15, 2008 email from Carlson to Dugaw regarding McMurphy and Taylor, admitted as Exhibit P-2.  The email refers to very "specific" discussions McMurphy had had with Carlson about her desires, and the email at various times, ingratiates, persuades, compliments, criticizes, threatens and conciliates with Dugaw. It included an attachment of some of McMurphy's medical records from Dr. Floyd Smith, whose medical practice Carlson managed in addition to his businesses.   Dugaw was obviously concerned about Taylor's relationship with McMurphy and Carlson strives to convince him that, first, it is "match made in heaven", and second, it is not his business.

3

During this same time frame, in June or July 2008, Taylor and Carlson began discussing the possibility of making a loan to Carlson of funds deposited by McMurphy into the McMurphy/Taylor joint bank account after the sale of her property.  The parties differ on who originated the idea, but they agree that McMurphy was earning very little interest on the money and Carlson offered to pay a significantly higher interest rate.  On July 24, 2008, just nine days after Carlson's email to Dugaw advising him to stay out of McMurphy's affairs, Taylor wrote Carlson a check for $300,000 at the kitchen table of the home Taylor shared with McMurphy, with McMurphy also sitting there.  The check was signed by Taylor, written from the joint account and there is no dispute that the funds had come from McMurphy.  Three days later on July 27, Carlson signed a Promissory Note payable to Taylor, effective as of July 24, 2008, which Carlson had prepared. McMurphy was not named on the Note and Taylor testified that Carlson had recommended that Taylor not put McMurphy's name on the Note because she was so old. The loan was unsecured, provided 6% interest, called for monthly payments of the accruing interest on the first day of each month starting August 1, 2008, and had a balloon payment of the principal and any remaining interest on August 1, 2009.

The discussions leading up to the loan form the crux of this case.  Taylor testified that Carlson made a number of representations to him at or before the time the loan was made regarding Carlson's ability to repay it:  (1) that Carlson had a line of credit with Security State Bank for $300,000 which he could access to repay the loan at any time if Taylor or McMurphy needed the funds back; (2) that Carlson's business had made a $2 million profit; (3) that Carlson was going to use the loan for his business, without stating specifically how it would be used; and (4) that Carlson told McMurphy and Taylor that they did not need a lawyer regarding the loan.  Taylor also testified that Carlson showed him an "income statement" regarding the profitability of his company prior to signing the note, but Taylor did not ask to keep the document and was vague about what was in the statement.

Carlson denied that he made any representations about his line of credit, and testified that the lines of credit were in fact exhausted. He admitted that he had used the line of credit to pay a lump sum settlement of $120,000 in May 2008 in connection with a lawsuit by an Ecuadoran business

4

1   arising from student placements. Carlson also denied making representations about his business's

2   income, and denied that he provided any financial statements to Taylor before the loan was made.

3       Although Taylor maintained at trial that he was acting on behalf of McMurphy regarding this

4   loan, he put the payments that Carlson made into a personal account in his name. He claimed Carlson

5   persuaded him to open an account in his individual name, not joint, to deposit the payments on the

6   note from Carlson with the inexplicable rationale that it would enable Taylor to see how much money

7   he (Taylor) was earning for McMurphy from the loan.

8       Carlson made payments on the loan for four months, from August 2008 to January 2009. In the

9   meantime he travelled extensively worldwide trying to recruit students for his new venture. The venture

10  did not succeed, which Carlson attributes to the troubles of the world economy. Taylor's testimony

11  from the state court case, Defendant's Exhibit 20, indicates that the parties had a falling out in their

12  relationship in the fall of 2008 and stopped communicating.   There was no evidence of any payments

13  between January 2009 and August 2009, when Carlson sent a last check with a letter asking Taylor to

14  extend the maturity date of the loan.   Taylor did not agree and commenced a state court lawsuit

15  against Carlson on August 20, 2009 in his own name.   Taylor obtained a summary judgment in the

16  state court action for approximately $345,000 including the principal balance on the note, interests,

17  costs and fees.

18      Carlson filed for Chapter 7 Bankruptcy on September 9, 2010.

19      Res Judicata and Judicial Estoppel

20      As to Carlson's argument that Taylor somehow is precluded from making the fraud-based

21  claims in this action because he failed to make the allegations in the state court action on the note, it

22  may kindly be characterized as a novel argument.

23      The doctrine of res judicata applies when a prior judgment has a concurrence of identity in four

24  respects with a subsequent action: (1) subject matter; (2) cause of action; (3) persons and parties; and

25  (4) the quality of the persons for or against whom the claim is made. *See Rains v. State*, 100 Wn.2d

660, 663, 674 P.2d 165 (1983).  Res judicata does not apply here because, at a minimum, the subject

1   matter and causes of actions alleged here are not identical to those raised in the state court action.

2   The state court action dealt with a straightforward, and relatively easy to prove, action on the note.

3   The issue before this court is whether that judgment is non-dischargeable.

4         Similarly, the Court concludes that judicial estoppel does not apply in this case. Plaintiff did not

5   need to allege fraud to sue on a promissory note in state court, and he has not asserted contrary

6   positions in this action from the state court action, in an attempt to seek an advantage.   Therefore,

7   Plaintiff was not precluded from making the Section 523(a)(2) fraud claims in Bankruptcy Court

8         Section 523(a)(2)(B)

9         As to Plaintiff's 523(a)(2)(B) claim,  I conclude that Plaintiff presented insufficient evidence in

10   either his case in chief or in rebuttal to meet his burden of proof on various elements of this claim.

11   Non-dischargeability under 523(a)(2)(B) requires a demonstration by a preponderance of evidence

12   that there was "use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or

13   an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money,

14   property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published

15   with intent to deceive;…"

16         The testimony offered regarding the written statement and what it contained was vague and

17   minimal. Taylor testified that it was an income statement about Carlson's business. Taylor did not

18   testify that he asked for it, and did not even keep the document. The document was never found

19   during discovery, much less produced at trial.  Taylor's attempt to establish the document's existence

20   and contents fails to meet his evidentiary burden of proof. Taylor also failed to show what the income

21   statement contained, much less that the contents were material and false, or that he relied upon it

22   making this loan.

23         Section 523(a)(2)(A)

24         Section 523(a)(2)(A) excepts from discharge any debt for money, property, services or an

25   extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false

representation, or actual fraud. To prevail on a 523(a)(2)(A) claim, a creditor must prove five elements

6

by a preponderance of the evidence: (1) a misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of her statement or conduct; (3) an intent to deceive; (4) justifiable reliance on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. *See Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000).

The Court believes there was a fraud perpetrated here, and Carlson was at least part of it. He was in difficult financial straits, having used up his line of credit with Security State Bank to settle a lawsuit. He saw an opportunity to obtain control over an elderly woman's finances, and ultimately received $300,000, money he needed to finance his new venture. Unfortunately and inexplicably, McMurphy is not the plaintiff in this action. What is more difficult is placing Taylor in this story. Was he duped by Carlson, as he strove to suggest? Or is he trying to justify his actions after the fact as McMurphy's fiduciary, especially given the investigation by Washington's Adult Protective Services? Was this a scheme hatched by Carlson and Taylor to take advantage of an elderly woman? Or is this lawsuit simply a matter of Taylor seeking retribution from Carlson after their personal relationship fell apart?

Initially, the Court will note that it does not read the limitation in § 523(a)(2)(A) that misrepresentations alleged as a basis for recovery cannot be statements of financial condition as narrowly as Carlson would argue. While some of the alleged statements by Carlson do constitute statements of financial condition that are not actionable under 523(a)(2)(A), the alleged statements by Carlson about his business's income or about his line of credit at Security State Bank do not fall within that exception. *See, e.g., Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 714 (10th Cir. 2005) (applying strict interpretation that statements of financial condition must be communications "presenting an overall picture of the debtor's financial position . . . communications that purport to state debtor's overall net worth, overall financial health, or equation of assets and liabilities."); *Prim Capital Corp. v. May (In re May)*, No. 06-8044, 2007 Bankr. LEXIS 2335 at *17 (6th Cir. B.A.P. July 19, 2007) (same). As both authorities cited by the parties found, representations about sources of income that

7

1  could be looked to for repayment are not statements of financial condition.  *See In re Joelson*, 427 F.

2  3d at 715; *In re May*, 2007 Bankr. LEXIS at *20-21.

3       This Court's fundamental problems with Taylor's case are that whatever portion of the alleged

4  misrepresentations may have been made, Taylor ultimately failed to prove that he relied on these

5  misrepresentations in making this loan, much less that his reliance was justifiable; Taylor failed to

6  prove that Carlson perpetrated a fraud on Taylor.  The burden of proof as to all of the 523(a)(2)(A)

7  elements is on Taylor and the Court cannot conclude from the evidence presented that Taylor was

8  defrauded. For whatever reasons, Taylor (and Carlson) failed to call any other witnesses, and Taylor

9  stipulated not to produce evidence on a range of topics which one might expect to raise if one really

10 felt himself the victim of a fraud. The Court was left largely with unsubstantiated representations by

11 Taylor about what Carlson told him, which Carlson in turn denied. What light would Mr. Dugaw, or Mr.

12 LaPlante or Mr. Kelly have shed on this story?  The question remains unanswered.  The Court

13 concludes there is insufficient evidence that Taylor relied on any statement made by Carlson when he

14 made the loan. Based on the evidence presented to the Court believes Taylor would have made this

15 loan to Carlson regardle ss of the alleged misrepresentations.

16       Conclusion

17       The Court concludes that the claims for non-dischargeability by Taylor against Carlson should

18 be dismissed, and will enter an order a judgment based on these findings and conclusions.

19

20

21

22

Brian D. Lynch

United States Bankruptcy Judge Idge

(Dates as of Entered on Docket date above)

23

24

25

8