1

2

3

4

5

6          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
7                   AT TACOMA

8    ERIC CARLSON,                          CASE NO. 15-5913 RJB

9                    Plaintiff,             ORDER ON PLAINTIFF'S
                                            MOTION FOR ORDER OF
10         v.                               PARTIAL SUMMARY
                                            JUDGMENT AND VARIOUS
11   LEWIS COUNTY HOSPITAL                  OTHER MOTIONS
     DISTRICT No.1, a Washington
12   governmental entity; ROSS JONES, a
     married man; JUDY RAMSEY,
13   a married woman; KENTON SMITH, a
     married man; MARC FISHER, a married
14   man; SHANNON KELLY, a married
     woman; SHERI HENDRICKS, a married
15   woman,

16                    Defendants.

17

18       This matter comes before the Court on the Plaintiff's Motion for Order of Partial

19   Summary Judgment (Dkt. 38), the Defendants' opposition, or in the alternative, motion to delay

20   the Plaintiff's motion under Fed. R. Civ. P. 56 (d) (Dkt. 54), and Defendants' Motion to

21   Continue Trial Date and Extend Deadlines (Dkt. 62).  The Court has considered the pleadings

22   filed regarding the motions and the remaining record.

23       On December 15, 2015, Plaintiff, a gay man, filed this case asserting claims for violation

24   of his procedural due process and equal protection rights under the U.S. Constitution (pursuant to

1  42 U.S.C. § 1983) and for violations of the Washington Law Against Discrimination, RCW

2  49.60, *et. seq.* ("WLAD") in connection with the termination of his employment.  Dkt. 1.

3  Plaintiff seeks damages, attorney's fees and costs.  *Id.*

4     Pending before the Court is Plaintiff's motion for partial summary judgment in which he

5  moves for an order that: (1) Defendant Lewis County Hospital District No. 1 ("Hospital

6  District") violated Plaintiff's rights under WLAD, (2) Plaintiff's equal protections rights were

7  violated, and (3) his procedural due process rights were violated.  Dkt. 38. Defendants oppose

8  the motion, arguing that it should be denied outright. Dkt. 54.  If the motion is not denied at this

9  point, Defendants move for a delay on consideration of the motion, pursuant to Fed. R. Civ. P.

10  56 (d), until the deposition of Seth Whitmer.  Dkt. 54.  For the reasons provided, the Plaintiff's

11  motion (Dkt. 38) should be denied as to his claims under the WLAD and equal protection clause,

12  denied without prejudice as to his due process claims, and the Defendants' Rule 56(d) motion

13  regarding Plaintiff's due process claims (Dkt. 54) should be granted.  Defendants' motion to

14  continue the case deadlines (Dkt. 62) should be granted.

15                      **I.     FACTS AND PENDING MOTIONS**

16     **A.  FACTS**

17     Plaintiff Eric Carlson was hired by the Hospital District as the Chief Financial Operator

18  of Morton General Hospital ("Morton") on November 21, 2014.  Dkt. 51-1, at 11.  Seth

19  Whitmer, the Chief Executive Officer ("CEO") of Morton, made the decision to hire Plaintiff the

20  day he interviewed him. *Id.,* at 12. In his application, Plaintiff did not provide references from

21  people for whom he had worked; the references listed were "character references."  Dkt. 51-1, at

22  17.

23

24

1     The Hospital District is governed by an elected board of commissioners ("board"), who

2  are the individually named Defendants here along with Shannon Kelly, the Human Resources

3  Director for Morton.  Dkt. 55-1, at 77.  The board hires and fires the CEO (that is the only

4  position for which they make personnel decisions), acts as a liaison between the hospital and the

5  community, and monitors the hospital's finances.  Dkt. 55-1, at 77.  The CEO reports to the

6  board.  Dkt. 55-1, at 78.

7     The parties dispute the state of Morton's accounting system at the time Plaintiff was

8  hired.  Plaintiff asserts it was "a disaster" (Dkt. 1) while Defendants state that there were

9  "challenges," they deny that the accounting system was in as dire straits as asserted by Plaintiff

10  (Dkt. 10).

11     In December of 2014, Mr. Whitmer awarded Plaintiff a retention bonus.  Dkt. 55-1, at 27.

12  This was not unusual, though, because Mr. Whitmer gave "bonuses to nearly every person he

13  hired."  Dkt. 55-1, at 27.

14     Plaintiff testified that a former employer, Dr. Floyd Smith, played a role in sabotaging his

15  position at Morton.  Dkt. 55-1, at 9.  Plaintiff states that he believes that Dr. Smith "started it," in

16  fact.  Dkt. 55-1, at 10.  Plaintiff indicates that he believes that Dr. Smith contacted the "board of

17  directors and told them that not only was [he] a homosexual but that [he] was a fraudulent person

18  and that [he] somehow had this magical ability to send the hospital's money around the world to

19  secret bank accounts and all sorts of stories."  Dkt. 55-1, at 9.

20     Defendant Shannon Kelly, the Human Resources Director for Morton, states that she

21  thinks that she was the first person to tell Mr. Whitmer about an opinion by a Western District of

22  Washington bankruptcy judge that Plaintiff may have been involved in a fraud.  Dkt. 55-1, at 29.

23  That opinion is attached.  In dicta, the opinion provides, in part:  "[t]he Court believes there was

24

1   a fraud perpetrated here, and [Plaintiff] Carlson was at least part of it.  He was in difficult

2   financial straits . . . He saw an opportunity to obtain control over an elderly woman's finances,

3   and ultimately received $300,000, money he used to finance his new venture."  Dkt. 54, at 34.  In

4   any event, Defendant Kelly became aware of this court opinion when she was contacted by

5   Diane Markham.  Dkt. 55-1, at 29.  Ms. Markham, the Executive Director of the Eastern Lewis

6   County Hospital Foundation, testified that she first heard about the bankruptcy opinion from

7   other foundation members.  Dkt. 55-2, at 24-27.  Ms. Markham told Defendant Kelly that the

8   document was publically available on the internet and that there were public "concerns."  Dkt.

9   55-1, at 29.  Defendant Kelly told Mr. Whitmer about the document, but she did not read it.  Dkt.

10  55-1, at 29-30.

11          Defendant board member Kenton Smith first learned of the fraud allegation regarding

12  Plaintiff in the bankruptcy court's opinion a few weeks before Plaintiff was fired.  Dkt. 55-1, at

13  79.  Defendant Smith testified that:

14          An almost James-Bondish lady came up to me in church and was walking by me.
            And I thought, well, I don't know the lady, but she's walking by me rather - - -

15          rather close to me, and she was carrying some papers.  And as we walked by, she
            slapped the papers under my arm, pulled my arm down, and said simply, "Read

16          this" and kept walking. . . And even a week or two later, her husband met me at
            the door as I was leaving church . . . and he wanted to know if I had read those

17          papers that his wife had given me a week earlier.

18  Dkt. 55-1, at 79.  Defendant Smith later learned that the couple's ("last name Ferch") adult

19  daughter was a nurse at a doctor's office in Packwood, Washington.  Dkt. 55-1, at 80.  The

20  record is not clear on the Ferch's connection with Plaintiff.  Defendant Smith states that he read

21  the bankruptcy court's opinion and then contacted Mr. Whitmer.  Dkt. 55-1, at 81.  Defendant

22  Smith testified that he told Mr. Whitmer how he ended up getting the opinion and that "[he]

23

24

ORDER ON PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT AND
VARIOUS OTHER MOTIONS- 4

1  thought [Mr. Whitmer] should take a look at [the opinion] and that's all [Defendant Smith] said."

2  Dkt. 55-1, at 81.

3          Defendant board member Marc Fisher states that around that time, he was in a hardware

4  store owned by Joy Watt.  Dkt. 55-1, at 96.  Ms. Watt called Defendant Fisher into her office and

5  handed him the bankruptcy court's opinion regarding Plaintiff, and said, "you better read [this]."

6  Dkt. 55-1, at 97.  Defendant Fisher states that he did not read or discuss the document further

7  with Ms. Watt.  Dkt. 55-1, at 98.  He later read the opinion.  Dkt. 55-1, at 98.  Defendant Fisher

8  called Defendant Smith.  Dkt. 55-1, at 98.  Defendant Fisher states that he and Defendant Smith

9  felt that this was serious - they had "a man that committed a fraud heading our finance

10  department."  Dkt. 55-1, at 100.

11          Defendant board member Ross Jones states that he first learned of ethical concerns the

12  community had about Plaintiff's suitability for the CFO position at Morton through two

13  community members:  Don Bishop and Glenn Allen.  Dkt. 55-1, at 46-47.  Both men referred

14  Defendant Jones to the bankruptcy judge's opinion.  Dkt. 55-1, at 47.  After reading the portion

15  of the opinion that discusses the bankruptcy court's belief in Plaintiff's participation in the fraud,

16  Defendant Jones contacted Defendant Fisher, who had also recently become aware of the

17  opinion, and they discussed it.  Dkt. 55-1, at 48.  Defendant Jones expressed his concern that

18  Plaintiff had engaged in "unethical behavior."  Dkt. 55-1, at 49.

19          Defendant board member Judy Ramsey states that Joy Watt also told her about the

20  bankruptcy court's opinion involving Plaintiff, and the next day, Defendant Fisher gave her a

21  copy.  Dkt. 55-2, at 7.  While she did not read the entire document, she read the portion that

22  discussed Plaintiff and allegations of fraud.  Dkt. 55-2, at 6.

23

24

In a December 17, 2014 executive session, the board members (except Defendant board member Sheri Hendricks who was in Arizona) discussed their concerns with Mr. Whitmer, about the judicial opinion and community members' "grave concerns" that Plaintiff had engaged in "unethical behavior" involving a fraud. Dkts. 55-1, at 50; 55-2, at 8-9. The board instructed Mr. Whitmer to look into it further. Dkt. 55-2, at 9. The board did not order a private investigator be hired. Dkt. 55-1, at 54. Further, each of the board members present at the meeting deny that any discussion of Plaintiff's sexual orientation occurred, particularly as a reason to fire Plaintiff. Dkts. 56, at 2; 57, at 2; 58, at 2; 59, at 2; and 61 at 2.

On December 24, 2014, Defendant board member Sheri Hendricks received an email from Glenn Allen. Dkt. 55-1, at 58. She was in Arizona. Dkt. 39-6, at 5. Defendant Hendricks testified that was the first time she heard that there was a fraud allegation against Plaintiff. Dkt. 55-1, at 58. Defendant Hendricks states that Mr. Allen attached the bankruptcy court's opinion to the email. Dkt. 55-1, at 58. Defendant Hendricks read the opinion and then talked with Defendant Fisher and Defendant Smith. Dkt. 55-1, at 59. She told both men she was concerned. Dkt. 55-1, at 61.

Defendant Smith states that one evening, while Defendant Fisher was at his home, he received a call from Dr. Floyd Smith. Dkt. 55-1, at 82. Dr. Smith, one of Plaintiff's prior employers, wanted to discuss Plaintiff's employment at Morton. Dkt. 55-1, at 82 and 100. The phone was placed on speaker. Dkt. 55-1, at 82 and 100. Dr. Smith told them that he lost money to Plaintiff, and that "no matter what, [Plaintiff] should not be in a position where he could handle money or accounts." Dkts. 55-1, at 82. Dr. Smith testified that while Plaintiff worked for him, there were "financial irregularities," including "transfer of funds that couldn't adequately be explained." Dkt. 55-2, at 14.

1    Defendants Smith and Fisher then called Mr. Whitmer.  Dkt. 39-3, at 5.  Defendant Fisher

2    states that he explained to Mr. Whitmer, "what we had," and asked "what he [was] going to do

3    about it?"  Dkt. 39-3, at 5.  Defendant Fisher testified that he knew that Mr. Whitmer had the

4    bankruptcy judge's opinion, but was "resisting," and was not going to read it.  Dkt. 39-3, at 5.

5    Defendant Fisher told Mr. Whitmer, "You have got to make a decision" about whether to keep

6    Plaintiff.  Dkt. 39-3, at 5.  In response to Mr. Whitmer's concern that his job as CEO was at risk,

7    Defendant Fisher replied that "[w]ell I don't know.  I am just one vote."  Dkt. 55-1, at 110.

8    Dr. Smith testified that he received a call from Mr. Whitmer about Plaintiff.  Dkt. 55-2, at

9    19.  The record does not provide the date of the call, but it was after Dr. Smith talked with

10   Defendant Smith.  Dkt. 55-2, at 19.  Dr. Smith told Mr. Whitmer about his concerns regarding

11   the financial irregularities he thinks Plaintiff engaged in while handling Dr. Smith's billing and

12   accounts, and gave him a list of other people that would have information about Plaintiff's

13   financial misconduct.  Dkt. 55-2, at 19.

14   Defendant Kelly testified that she was hesitant for them to terminate Plaintiff's

15   employment.  Dkt. 39-2, at 15.  She states she "felt like [she] didn't have enough information"

16   because the only information she had at the time was "[j]ust Seth [Whitmer] saying that he was

17   terminating [Plaintiff] because of this statement the judge made regarding fraud."  Dkt. 39-2, at

18   15.  Defendant Kelly states that she did not talk with any of board members about the

19   termination of Plaintiff's employment.  Dkt. 55-1, at 31.

20   About December 28th or 29th, Mr. Whitmer called Defendant Hendricks (who was still in

21   Arizona) and asked whether she was aware of the fraud allegation in the bankruptcy opinion

22   involving Plaintiff.  Dkt. 55-1, at 64.  Defendant Hendricks told Mr. Whitmer that she read the

23

24

1  opinion, was concerned about its implications, and had spoken to both Defendant Fisher and

2  Defendant Smith.  Dkt. 55-1, at 64.

3       A little later, Mr. Whitmer called Defendant Hendricks again and told her that he was

4  "setting [the termination of Plaintiff's employment] in motion."  Dkt. 55-1, at 70.

5       Around December 31, 2014, a hearing was held between Mr. Whitmer and Plaintiff.  Dkt.

6  39-2.  Defendant Kelly was there as a note taker.  Dkt. 39-2, at 7.  Shana Garcia (Mr. Whitmer's

7  assistant) was also present, at Mr. Whitmer's request, to "notate" Plaintiff's "mannerisms and his

8  reactions" and to record his responses.  Dkt. 55-2, at 33.  Ms. Garcia testified that Plaintiff came

9  in and Mr. Whitmer gave Plaintiff an opportunity to share what he knew about the bankruptcy

10 case.  Dkt. 55-2, at 34.  Ms. Garcia states that Plaintiff "walked us through his side of the case"

11 and Mr. Whitmer asked him questions.  Dkt. 55-2, at 35.  According to Defendant Kelly, at that

12 meeting, Mr. Whitmer put Plaintiff on a leave of absence because "[Mr. Whitmer] was going to

13 look into it further and [Plaintiff] would have an opportunity to share information about that."

14 Dkt. 55-1, at 31-32.   Plaintiff testified that, at the first hearing, he told them he had not

15 committed fraud.  Dkt. 55-1, at 18.  They decided to meet again.  Dkt.  55-1, at 32.

16      Plaintiff asked his attorney from the bankruptcy proceeding, Larry Fagerness, to contact

17 Mr. Whitmer, and explain what happened in the case.  Dkt. 55-1, at 19.  Plaintiff believes that

18 Mr. Fagerness did call Mr. Whitmer and gave him information about it.  Dkt. 55-1, at 19.

19      On January 5, 2015, Mr. Whitmer held another hearing with Plaintiff.  Plaintiff states that

20 at this hearing, he brought portions of the bankruptcy code to explain "why this was a completely

21 made-up thing."  Dkt. 55-1, at 19.  He explained the general factual context in both hearings, and

22 at this second meeting, tried to show that he did not commit fraud under the bankruptcy code.

23 Dkt. 55-1, at 20.  Ms. Garcia reports that Mr. Whitmer informed Plaintiff that due to the fraud

24

1    allegation, he could no longer serve as CFO.  Dkt. 55-2, at 38.  Ms. Garcia states that Plaintiff

2    was not pleased.  Dkt. 55-2, at 38.  Plaintiff was told at this second hearing that Mr. Whitmer

3    would be "in touch."  Dkt. 55-1, at 34.

4         Plaintiff was then sent a letter terminating his employment.  Dkt. 55-2, at 41.  Plaintiff

5    acknowledges that the letter does not contain the word "fraud" and is merely "boilerplate"

6    language.  Dkt. 51-1, at 21-22.

7         After the termination of Plaintiff's employment at Morton, Mr. Whitmer related to the

8    board that he let Plaintiff go. Dkt. 55-1, at 61.  Defendant Hendricks thought Mr. Whitmer

9    appeared "boastful" about firing Plaintiff.  Dkt. 55-1, at 63.  Each of the board members present

10   at the meeting deny that any discussion of Plaintiff's sexual orientation occurred as a reason to

11   terminate his employment.  Dkts. 56, at 2; 57, at 2; 58, at 2; 59, at 2; and 61, at 2.

12        After Plaintiff left Morton's employ, Mr. Whitmer informed the board that he had hired a

13   computer company in order to determine whether Plaintiff had any "inappropriate computer

14   usage."  Dkt. 55-1, at 72.  Defendant Hendricks testified that the only person she ever heard

15   express concerns about Plaintiff's possible inappropriate computer usage was Mr. Whitmer.

16   Dkt. 55-1, at 73.  Mr. Whitmer also advised the board to get Lifelock (a personal identity theft

17   protection service), and that he had done so as well. Dkt. 55-1, at 73.

18        The board fired Mr. Whitmer on March 11, 2015.  Dkt. 20, at 2.  Mr. Whitmer filed suit

19   against the Hospital District regarding the termination of his employment.  Dkt. 25, at 22.  Mr.

20   Whitmer then contacted Plaintiff and asked Plaintiff for an affidavit.  Dkt. 25, at 22.  Later, Mr.

21   Whitmer visited Plaintiff at Plaintiff's home to discuss Plaintiff providing an affidavit and the

22   circumstances of Plaintiff's firing.  Dkt. 25, at 22.  Mr. Whitmer later provided Plaintiff an

23   affidavit.  Dkt. 25, at 22.

24

1        In support of his instant motion for partial summary judgment, Plaintiff relies on this

2   affidavit by Mr. Whitmer, which was originally filed in support of Plaintiff's motion to compel.

3   Dkt. 20.  In this affidavit, Mr. Whitmer asserts that the "[b]oard members told me they did not

4   want a homosexual working at 'their' hospital." Dkt. 20, at 7.  He maintains that "[t]he board

5   members knew they could not force me to fire someone based on sexual orientation. Therefore,

6   the [board] hired private investigators to dig up any old dirt on Mr. Carlson so the [board] would

7   have a 'reason' to force me to fire Eric Carlson." Dkt. 20, at 8.  He alleges that "[e]ventually, the

8   [board] members found an old court case regarding a business Mr. Carlson had owned." Dkt. 20,

9   at 8. Mr. Whitmer states that he objected to terminating Plaintiff's employment.  Dkt. 20, at 9.

10  According to Mr. Whitmer, "under duress" from the board, he consulted Morton's attorney, Julie

11  Kebler, of the law firm Garvey Schubert Barer, regarding the legality of firing Mr. Carlson.  Dkt.

12  20, at 8.  He alleges that "[a]fter an extensive review of the situation, [Morton]'s attorney

13  advised that [Morton] use Mr. Carlson's prior bankruptcy and a court case in which a judge

14  mentioned that Mr. Carlson 'may' have committed fraud . . . (but there was no evidence of a

15  fraud) as a pretext for firing him." Dkt. 20, at 8.  Mr. Whitmer asserts that he "was given a

16  regimented process to follow as Mr. Carlson had no performance issues and it was well known

17  regarding the [board's] and communities' dislike for Mr. Carlson being homosexual." Dkt. 20,

18  at 8.  Mr. Whitmer claims that the attorneys advised him to place Mr. Carlson on administrative

19  leave "to make it appear an investigation was being conducted so Mr. Carlson would hopefully

20  not bring a wrongful termination and discrimination suit against the hospital." *Id.,* at 9.  He

21  maintains that no investigation was conducted and there was never any intention to do so.  *Id.*

22  Under threats from the hospital's board regarding the security of his own job, Mr. Whitmer states

23  that he was forced to fire Plaintiff "because of his sexual orientation." *Id.*

24

ORDER ON PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT AND
VARIOUS OTHER MOTIONS- 10

1    Defendant Ramsey directly disputes Mr. Whitmer's assertion in his affidavit that she did

2    not like Plaintiff or that she "expressed distaste in placing a homosexual man in a role as a

3    member of leadership" at Morton.  Dkt. 56, at 1-2.  She states that she did not instruct Mr.

4    Whitmer to terminate Plaintiff's employment based on his sexual orientation and did not make

5    any of the statements that Mr. Whitmer attributes to the "board."  Dkt. 56, at 2.  Defendant

6    Ramsey states that she did not hear any of the other board members make any of these

7    statements.  Dkt. 56, at 2.  She did not hire an investigator to look into Plaintiff's background.

8    Dkt. 56, at 2.

9    Defendant Smith states that he did not make the statements Mr. Whitmer attributes to him

10   or the "board" in the Whitmer affidavit regarding Plaintiff's sexuality.  Dkt. 57, at 1.  He denies

11   accusing Plaintiff of pedophilia or participation in the sex trade.  Dkt. 57, at 1.  Defendant Smith

12   states that he has a friend who is a private investigator who looked into Plaintiff on an unrelated

13   matter.  Dkt. 57, at 2.  Defendant Smith states that his friend warned him about the Plaintiff and

14   then Defendant Smith passed on what his friend told him to the other board members.  Dkt. 57,

15   at 2.  Defendant Smith denies ever hiring an investigator to look into Plaintiff's background.  Dkt.

16   57, at 2.  Defendant Smith states that he did not instruct Mr. Whitmer to fire Plaintiff based on

17   his sexual orientation.  Dkt. 57, at 2.

18   Defendant Fisher also directly disputes that he made any statement in the Whitmer

19   affidavit regarding Plaintiff's sexual orientation.  Dkt. 58, at 1-2.  He states that he did not hire a

20   private investigator to look into Plaintiff's background, and he did not tell Mr. Whitmer that he

21   had done so to find an excuse to terminate Plaintiff's employment.  Dkt. 58, at 1-2.  Defendant

22   Fisher denies ordering Mr. Whitmer to fire Plaintiff based on his sexual orientation.  Dkt. 58, at

23   2.  He did not hear any other member of the board do so either.  Dkt. 58, at 2.

24

1    Defendant Jones states that he did not make any of the statements Mr. Whitmer's

2  affidavit asserts Defendant Jones (or the "board") made regarding Plaintiff's sexuality.  Dkt. 59,

3  at 1.  Defendant Jones states that he had a "good impression" of Plaintiff after the first time he

4  met him.  Dkt. 59, at 2.  He did not instruct Mr. Whitmer to fire Plaintiff based on his

5  homosexuality.  Dkt. 59, at 2.

6    Defendant Hendricks denies that she made any of the statements regarding Plaintiff's

7  sexuality attributed to her in the Whitmer affidavit.  Dkt. 61.  She did not instruct him to fire

8  Plaintiff because he was a homosexual.  Dkt. 61, at 2.  Defendant Hendricks explains that one of

9  her close family members is lesbian.  Dkt. 61, at 2.  She states there was no discussion of

10  Plaintiff's sexual orientation.  Dkt. 61, at 2.  She that she "would have objected" if there had

11  been any negative comments about Plaintiff's homosexuality or the LGBTQ community.  Dkt.

12  61, at 2.

13    Defendant Human Resources Director Kelly also directly disputes that she ever stated

14  that she had "concerns" about Plaintiff's sexual orientation.  Dkt. 60, at 1.  She states that she

15  had several conversations regarding the termination of Plaintiff's employment, and at no point

16  did anyone make any mention of Plaintiff's homosexuality or make any negative statement about

17  gay people.  Dkt. 60, at 2.  Defendant Kelly states that her conversations with Mr. Whitmer and

18  Ms. Markham concerned the bankruptcy opinion and the fraud allegation.  Dkt. 60, at 3.

19  Defendant Kelly asserts that Mr. Whitmer never told her the board was pressuring him to fire

20  Plaintiff because of Plaintiff's sexuality.  Dkt. 60, at 3.

21    Defendant Jones had the impression that Mr. Whitmer fired Plaintiff because of "past

22  experiences" involving the "court case" that created an "ethical concern in the community,"

23  (Dkt. 55-1, at 45), but that it was Mr. Whitmer's job to fire employees, so Defendant Jones

24

1    "really didn't know" (Dkt. 39-7, at 13).  Defendant Fisher also states that he had no information

2    that Plaintiff was fired for any other reason than the fraud allegations and complaints in the

3    community about Plaintiff.  Dkt. 55-1, at 104.  Defendant Ramsey also testified that although she

4    specifically didn't know why Plaintiff was fired, based on the conversation at the executive

5    session about Plaintiff's possible involvement in a fraud, she assumed Mr. Whitmer fired

6    Plaintiff because of the allegations of fraud.  Dkt. 55-2, at 10.  Ms. Markham states that Mr.

7    Whitmer told her he fired Plaintiff and that she had no reason to believe that it was not related to

8    the fraud allegation. Dkt. 55-2, at 29.

9            B.       **PENDING MOTIONS AND ORGANIZATION OF THE DECISION**

10           In his pending motion, Plaintiff moves for an order that the Hospital District violated his

11   rights under WLAD because Plaintiff was fired for being gay.  Dkt. 38.  Plaintiff asserts that it is

12   undisputed that Mr. Whitmer was the only person who could fire Plaintiff and Mr. Whitmer

13   states that he did so under pressure from the board due to Plaintiff's homosexuality.  *Id.,* at 11.

14   Plaintiff moves for an order that his equal protection rights were violated by the Hospital District

15   because he was fired based on his sexual orientation.  *Id.*, at 13. (While this portion of his motion

16   is entitled "D. Mr. Carlson's Substantive Due Process rights Were Violated" he proceeds to

17   discuss his equal protection claim; he also states in his Reply that his constitutional claims

18   related to a name-saving hearing are not before the Court.)  Plaintiff argues that "there is no

19   dispute that Plaintiff was fired because he was gay."  *Id.*  He asserts that the board "encouraged

20   his firing and voiced their approval after the fact."  *Id.,* at 14.  Plaintiff argues that the board

21   ratified Mr. Whitmer's decision to fire Plaintiff at the January 6, 2015 board meeting.  *Id.*

22   Plaintiff also seeks an order granting summary judgment in his favor that his procedural due

23   process rights were violated.  *Id.*

24

1    Defendants oppose the motion, arguing that there are issues of fact as to whether Plaintiff

2    was terminated due to his sexual orientation, and so his motion that he is entitled to summary

3    judgment on his WLAD and equal protection claims should be denied. Dkt. 54. Defendants

4    argue that Plaintiff's motion for summary judgment should be denied as to his due process claim

5    because he was not entitled to a name-clearing hearing and the two hearings held were sufficient.

6    *Id.* To the extent that Plaintiff does make a due process claim that he is entitled to a name-

7    clearing hearing, Defendants move for summary dismissal. *Id.* In the alternative to denial of the

8    Plaintiff's motion for summary judgment, the Defendants move the Court to defer consideration

9    of the motion under Fed. R. Civ. P. 56(d). *Id.*

10    In reply, Plaintiff states that he "disagrees with the majority of the factual assertions

11    made by the Defendants." Dkt. 64. He argues that he was not an at-will employee, was entitled

12    to a *Loudermill* hearing, and that hearings he was given were inadequate. *Id.* Plaintiff points to

13    provisions of the Lewis County Washington employee's handbook. *Id.* He asserts that he is

14    entitled to a name clearing hearing, but that question is not yet before the Court. *Id.* Plaintiff

15    argues that the District is bound by Mr. Whitmer's statements as to why he fired Plaintiff

16    because he is the only person with personal information, and so summary judgment should be

17    granted to Plaintiff on his WLAD and equal protection claims. *Id.*

18    Plaintiff also raises issues regarding Defendants' responses to interrogatories. Dkt. 38

19    and 64. Plaintiff does not make a motion related to these discovery requests, so no action will be

20    taken on these issues.

21    Defendants file a surreply, and point out that, in regard to his due process claim,

22    Plaintiff's reliance on the Lewis County, Washington employee's handbook is in error. Dkt. 71.

23    Plaintiff worked for the Hospital District, which is a separate entity from Lewis County,

24

1   Washington.  Dkt. 72.  The Lewis County, Washington employee's handbook does not apply to

2   employees of the Hospital District.  *Id.*

3        Defendants also have pending a Motion to Continue Trial Date and Extend Deadlines

4   (Dkt. 67) in which they move to have the trial date continued until May 22, 2017 and have the

5   discovery and dispositive motions deadlines extended.  Dkt. 62.  Plaintiff does not oppose the

6   motion, but indicates that his counsel is unavailable for the May 22, 2017 trial date.  Dkt. 67.

7        This decision is organized as follows:  it will first provide the standard on summary

8   judgment, then address Plaintiff's motion for summary judgment on his claims for violation of

9   the WLAD and the Equal Protection Clause of the U.S. Constitution, then the cross motions on

10  Plaintiffs' claim for violation of his due process rights will be handled jointly with Defendants'

11  motion under Rule 56 (d), and lastly, the Defendants' motion to extend case deadlines.

12  **II.     <u>DISCUSSION</u>**

13  **A.  SUMMARY JUDGMENT STANDARD**

14       Summary judgment is proper only if the pleadings, the discovery and disclosure materials

15  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

16  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is

17  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

18  showing on an essential element of a claim in the case on which the nonmoving party has the

19  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

20  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

21  for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

22  (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

23  metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

24

ORDER ON PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT AND
VARIOUS OTHER MOTIONS- 15

1   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

2   requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

3   *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

4   *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

5        The determination of the existence of a material fact is often a close question.  The court

6   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

7   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect.*

8   *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

9   of the nonmoving party only when the facts specifically attested by that party contradict facts

10  specifically attested by the moving party.  The nonmoving party may not merely state that it will

11  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

12  to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

13  Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not

14  be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

15  **B.  PLAINTIFF'S STATE LAW CLAIM FOR VIOLATION OF WLAD**

16       Under the WLAD, "[i]t is an unfair practice for any employer to . . . discharge or bar any

17  person from employment because of age, sex, marital status, sexual orientation, [or] race . . ."

18  RCW 49.60.180 (2).  In Washington, "disparate treatment occurs when an employer treats some

19  people less favorably than others because of race, color, religion, sex, or other protected status."

20  *Alonso v. Qwest Commc'ns Co., LLC*, 178 Wash. App. 734, 743-44, 315 P.3d 610, 615-16

21  (2013)(*internal citation omitted*).  A plaintiff claiming a violation of the WLAD, "may establish

22  a prima facie case by either offering direct evidence of an employer's discriminatory intent, or by

23  satisfying the *McDonnell Douglas* burden-shifting test that gives rise to an inference of

24

ORDER ON PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT AND
VARIOUS OTHER MOTIONS- 16

1  discrimination." *Id.,* at 744 (*citing Johnson v. Dep't of Soc. & Health Servs.,* 80 Wash. App. 212,

2  226, 907 P.2d 1223 (1996) and *Kastanis v. Educ. Emps.' Credit Union,* 122 Wash.2d 483, 491,

3  859 P.2d 26, 865 P.2d 507 (1993).

4      Plaintiff's motion for summary judgment on his WLAD claim should be denied.  There are

5  issues of fact regarding Plaintiff's direct evidence of discrimination.  Plaintiff points to Mr.

6  Whitmer's statements, in his affidavit, that he was forced to fire Plaintiff due to Plaintiff's sexual

7  orientation.  There are issues of fact as to whether Mr. Whitmer was forced by the board to fire

8  Plaintiff due to his homosexuality.  All of the board members deny that they pressured Mr.

9  Whitmer to terminate Plaintiff's employment due to his homosexuality, or even that Plaintiff's

10 sexual orientation was ever discussed.  While Plaintiff asserts that Mr. Whitmer was the only

11 person with personal information as to why Plaintiff was fired, if viewed in a light most

12 favorable to Defendants, the record demonstrates that the board was concerned over Plaintiff's

13 possible role in a fraud and that community members, like Dr. Smith, were complaining about

14 Plaintiff's suitability to both the board and Mr. Whitmer.  The Defendants argue that Plaintiff's

15 sexual orientation was not the basis for the board's actions.  While the facts may be viewed as

16 supporting Mr. Whitmer's assertion that he was receiving pressure from the board to fire

17 Plaintiff, there are issues of fact as to why he was being pressured to do so.  This question will

18 turn on the credibility of the witnesses, including the credibility of Mr. Whitmer, who has his

19 own issues with the Defendants.

20     To the extent that Plaintiff argues that he is entitled to summary judgment based on an

21 inference of discrimination, his motion should be denied.  In the first step of the *McDonnell*

22 *Douglas* test, a plaintiff must establish a prima facie case of discrimination.  *McDonnell Douglas*

23 *Corp. v. Green*, 411 U.S. 792 (1973).  A plaintiff must establish that (1) they belong to a

24

ORDER ON PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT AND
VARIOUS OTHER MOTIONS- 17

protected class, (2) they were qualified for the position (they were performing their job in a satisfactory manner), (3) they were subjected to an adverse employment action, and (4) they were replaced by or were treated more favorably than a person outside the protected class. *McDonnell Douglas* at 802. In the second step, the defendant employer then must show a legitimate nondiscriminatory reason for the termination. *McDonnell Douglas* at 802. In the last step of the *McDonnell Douglas* test, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *McDonnell Douglas* at 802.

As to the first step, Plaintiff has offered evidence that he is gay, he was qualified for the position, and he was fired. There is no evidence in the record that he was replaced by a person outside his protected class. Even if there was such evidence, under the second step of the *McDonnell Douglas* test, the Hospital District has offered evidence from which a jury could infer that Plaintiff was fired due to the fraud allegations in the bankruptcy court's opinion and complaints from citizens like Dr. Smith. As to the last step, Plaintiff has offered evidence to rebut Defendants' evidence, that is, Mr. Whitmer's affidavit where he asserts that the board forced him to fire Plaintiff due to his sexual orientation, which of course, the Defendants dispute. Each of these witnesses' credibility is at issue and should be decided by a trier of fact. Plaintiff's motion for judgment summarily in his favor on the WLAD claim should be denied.

## C. PLAINTIFF'S CLAIMS FOR VIOLATION OF HIS CONSTITUTIONAL RIGHT TO EQUAL PROTECTION PURSUANT TO 42 U.S.C. § 1983

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

1   laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

2   *grounds, Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to

3   remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769

4   F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

5          Under 42 U.S.C. § 1983, a plaintiff must set forth the specific factual bases upon which

6   he claims each defendant is liable.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

7   Vague and conclusory allegations of official participation in a civil rights violations are not

8   sufficient to support a claim under § 1983.  *Ivey v. Board of Regents*, 673 F.2d 266 (9th Cir.

9   1982).  A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of

10  supervisory responsibility or position.  *Monell v. New York City Dept. of Social Services*, 436

11  U.S. 658, 694 n.58 (1978); *Padway v. Palches*, 665 F.2d 965 (9th Cir. 1982).

12         The precise nature of Plaintiff's constitutional claims (particularly against whom they are

13  asserted) is unclear.  To the extent that Plaintiff is making constitutional claims against the

14  individually named Defendants, in their personal capacities, his motion for summary judgment

15  should be denied.  He does not argue or make any showing that he is entitled to summary

16  judgment against them in their individual capacities on his constitutional claims.

17         Plaintiff does assert and argue constitutional claims against the Hospital District in his

18  briefing.  This opinion will now turn to addressing the Hospital District's potential liability under

19  § 1983.

20         A county or municipality is responsible for a constitutional violation only when an action

21  taken pursuant to a county or municipal policy of some nature caused the violation.  *Monell v.*

22  *Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  In order to

23  successfully plead §1983 liability on the part of the Hospital District, Plaintiff must allege: (1) he

24

ORDER ON PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT AND
VARIOUS OTHER MOTIONS- 19

was deprived of a constitutional right; (2) the Hospital District had a policy, practice, or custom; (3) the policy, practice or custom amounted to a deliberate indifference to his constitutional rights; and (4) the policy, practice or custom was the moving force behind the constitutional violation.  *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001)(*internal quotations omitted*).  The Ninth Circuit recognizes three ways to demonstrate a municipal policy, practice or custom:

> (1) the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate.

*Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008)(*internal citations and quotations omitted*).

Plaintiff does not contend that his constitutional rights were violated as a result of "a longstanding practice or custom which constitutes the standard operating procedure."  Accordingly, only the last two forms of policy, practice, or custom is relevant here.  This opinion will now look at Plaintiff's constitutional claims for violation of his equal protection rights.

The Fourteenth Amendment, provides, in part, that no State shall "deny to any person within its jurisdiction, the equal protection of the laws."  U.S. CONST. amend. XIV, § 1. The Equal Protection Clause proscribes "any purposeful discrimination by state actors, be it in the workplace or elsewhere, directed at an individual solely because of the individual's membership in a protected class." *Lindsey v. Shalmy*, 29 F.3d 1382, 1386 (9th Cir. 1994).  "To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (*citing Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir.1998)).

There are issues of fact as to whether Plaintiff was deprived of his constitutional rights under the Equal Protection Clause because there are issues of fact as to whether he was fired due to his sexual orientation.  The Court need not reach the question of whether the Hospital District had a policy, practice, or custom; whether the policy, practice or custom amounted to a deliberate indifference to his constitutional rights; or whether the policy, practice or custom was the moving force behind the constitutional violation.  Plaintiff's motion for summary judgment on his equal protection claim should be denied.

D. **CROSS MOTIONS ON PLAINTIFF'S CLAIMS UNDER THE DUE PROCESS CLAUSE AND DEFENDANTS' MOTION UNDER RULE 56(d)**

To the extent that both parties moved for summary judgment on Plaintiff's due process claims, the motions should be denied without prejudice, to be renoted, if appropriate.  The exact nature of these claims, and against whom they are asserted, is less than clear from the motions.  There is some conflation of procedural due process and substantive due process.  In any event, it is clear that the deposition of Mr. Whitmer is necessary to resolve dispositive motions, if any, regarding these claims.

Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  A party requesting relief pursuant to Rule 56(d) "must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment."  *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).

The Defendants' Rule 56(d) motion (Dkt. 54) should be granted as to Plaintiff's due process claim.  Dispositive motions regarding this claim may be renoted, if appropriate, after the

1   conclusion of Mr. Whitmer's deposition.  The Defendants have sufficiently shown specific facts

2   that further discovery would reveal and has explained why those facts may preclude summary

3   judgment.  *Tatum*, at 1100.

4       **E. DEADLINES**

5       On December 14, 2016, the Plaintiff's motion for an order finding that Defendants waived

6   the attorney-client privilege was granted.  Dkt. 28.  (Plaintiff's motion was filed on the last day

7   such motions were allowed under the case schedule). That order granted the Plaintiff's motion to

8   compel the Defendants to respond to Plaintiff's First Interrogatories and Requests for Production

9   and produce all documents related to the evaluation of how to terminate Plaintiff's employment,

10  including those that contained the advice of counsel.  *Id.*  The December 14, 2016 Order noted

11  that there may be issues regarding Washington's Rules of Professional Conduct ("RPC") 3.7

12  "Lawyer as Witness," and perhaps others, including RPC 1.7 "Conflict of Interest: Current

13  Clients," for the Defendants' lawyers, and gave the Defendants' counsel until January 9, 2017 to

14  inform the Court of whether they intended continue in the case.  *Id.* Both parties were also

15  ordered to inform the Court by January 9, 2017 as to whether extension of the remaining case

16  deadlines is appropriate.  *Id.*

17      The Defendants then moved for reconsideration and/or clarification of that order.  Dkt. 29.

18  The Defendants argue that the Court based its conclusions on the "false premise" that Mr.

19  Whitmer accurately described his communications with the hospital's lawyers, and request that

20  the Court conduct an *in camera* review of the documents at issue.  *Id.*  After allowing Plaintiff to

21  respond, the Court did conduct an *in camera* review of the documents at issue.  The motion for

22  reconsideration (Dkt. 29) was noted for consideration on January 13, 2017.

23

24

ORDER ON PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT AND
VARIOUS OTHER MOTIONS- 22

1       On January 17, 2017 a hearing was held regarding the motion for reconsideration and

2 argument was heard on whether the attorney client privilege had been breached.  Dkt. 51.  The

3 parties were informed that while the Court did not find anything discoverable in the documents

4 provided *in camera*, no final decision on the motion for reconsideration could be made until after

5 the deposition of Mr. Whitmer.  Dkt. 68, at 3-4 and 19-25.  Parties at the hearing indicated that

6 they were hoping to take Mr. Whitmer's deposition in February, but no date had been set.  Dkt.

7 68, at 26.

8       On January 26, 2017, Defendants filed the instant Motion to Continue Trial Date and Extend

9 Deadlines.  Dkt. 62.  Defendants state in their motion that although both parties have been

10 attempting to schedule Mr. Whitmer's deposition (who lives out-of-state), his attorney is not

11 responding, and they have not yet been able to set up a date for it.  *Id.*  Defendants move for an

12 extension of the discovery and dispositive motions deadlines and of the trial date, which is set for

13 March 13, 2017.  *Id.*  Defendants request that the discovery deadline be moved to March 13,

14 2017, the dispositive motions deadline be moved to April 3, 2017 and the trial date be moved to

15 May 22, 2017.  *Id.*

16       Plaintiff generally agrees to the extension, but, his counsel states that he is unavailable for a

17 May 22, 2017 trial date.  Dkt. 67.  He states that he "has a number of matters scheduled

18 throughout the spring, summer, and into the fall of 2017" and proposes parties submit proposed

19 dates for the trial.  *Id.*

20       Deadlines need to be set in this case.  Defendants' motion for an extension of time should be

21 granted.  Trial should be reset to begin on May 22, 2017 at 9:30 a.m.  The case deadlines should

22 be reset as follows:

23       &bull;  Discovery completed by 3/17/2017,

24

ORDER ON PLAINTIFF'S MOTION FOR ORDER
OF PARTIAL SUMMARY JUDGMENT AND
VARIOUS OTHER MOTIONS- 23

- Dispositive motions due by 4/3/2017,

- Motions in Limine due by 4/24/2017,

- Pretrial Order due by 5/5/2017,

- Pretrial Conference set for 5/12/2017 at 08:30 a.m.,

- Trial briefs to be submitted by 5/12/2017, and

- Proposed voir dire/jury instructions due by 5/12/2017.

If Plaintiff's counsel still has a conflict two weeks from the above trial date, he should inform the Court, in writing, explaining the nature of the conflict, to receive assistance in resolving it.

Further, the Defendants' motion for reconsideration (Dkt. 29) should be renoted for February 28, 2017.

## III.   ORDER

Accordingly, it is **ORDERED** that**:**

- Plaintiff's Motion for Order of Partial Summary Judgment (Dkt. 38) **IS**:

  o **DENIED** as to Plaintiff's claims under the Washing Law Against Discrimination and Equal Protection Clause of the U.S. Constitution,

  o **DENIED WITHOUT PREJUDICE** as to Plaintiff's Due Process claims;

- Defendants' motion for summary judgment on Plaintiff's Due Process claims (Dkt. 54) **IS DENIED WITHOUT PREJUDICE;**

- Defendants' Motion to Continue Trial Date and Extend Deadlines (Dkt. 62) **IS GRANTED**;  the following deadlines are **RESET**:

  o Trial should be reset to begin on May 22, 2017 at 9:30 a.m.

  o Discovery completed by 3/17/2017,

  o Dispositive motions due by 4/3/2017,

1           o   Motions in Limine due by 4/24/2017,

2           o   Pretrial Order due by 5/5/2017,

3           o   Pretrial Conference set for 5/12/2017 at 08:30 a.m.,

4           o   Trial briefs to be submitted by 5/12/2017, and

5           o   Proposed voir dire/jury instructions due by 5/12/2017;

6   • The Defendants' Motion for Reconsideration (Dkt. 29) **IS RENOTED** for February

7     28, 2017.

8       The Clerk is directed to send uncertified copies of this Order to all counsel of record and

9 to any party appearing *pro se* at said party's last known address.

10       Dated this 7th day of February, 2017.

11

12

13                  ROBERT J. BRYAN
                    United States District Judge

14

15

16

17

18

19

20

21

22

23

24